649 So.2d 835 (1995)
Kirk FORDICE, acting in his official capacity as Governor of the State of Mississippi, the Mississippi Department of Environmental Quality, and the Mississippi Environmental Quality Permit Board
v.
Charles H. THOMAS, Jr., Linda Lee Thomas, William A. Thomas, Peggy Joyce Thomas, and Julian Wood Chancellor, Jr.
Charles H. THOMAS, Jr., Linda Lee Thomas, William A. Thomas, Peggy Joyce Thomas, and Julian Wood Chancellor, Jr.
v.
Kirk Fordice, acting in his official capacity as Governor of the State of Mississippi, the Mississippi Department of Environmental Quality, and the Mississippi Environmental Quality Permit Board.
No. 93-CA-1126.
Supreme Court of Mississippi.
January 26, 1995.
*837 Michael B. Wallace, Chuck D. Barlow, Phelps Dunbar Firm, Jackson, MS, Trudy D. Fisher, Jackson, MS, for appellant.
John C. Henegan, J. Collins Wohner Jr., Donna Brown Jacobs, L. Lee Tyner Jr., Butler Snow Firm, Jackson, MS, Michael C. Moore, Atty. Gen., Jackson, MS, T. Hunt Cole, Jr., Sp. Asst. Atty. Gen., Jackson, MS, James M. Hood, III, Sp. Asst. Atty. Gen., Jackson, MS, for appellee.
Robert B. Wiygul, New Orleans, LA, William L. Smith, Brunini Grantham Gorwer & Hewes, Jackson, MS, Eugene R. Wasson, Brunini Firm, Jackson, MS, John L. Maxey, II, J. Brad Pigott, Maxey Pigott Wann & Begley, Jackson, MS, for amicus curiae.
*838 Before HAWKINS, C.J., and PITTMAN and BANKS, JJ.
BANKS, Justice, for the Court:
This appeal compels us to determine whether our Administrative Procedures Law applies to rule making by the Office of the Governor and whether the adoption of a "Capacity Assurance Plan," as provided for in federal "Superfund" legislation, is such a rule within that law. We answer both questions in the affirmative. We conclude further that there was a failure to comply with the Administrative Procedures Law. It follows that the judgment of the trial court is affirmed as to its declaration of law. We also conclude, however, that the injunctive relief granted was overbroad and we remand for a modification of the judgment. Finally, we affirm as to plaintiffs' cross-appeal on the issues of punitive damages and attorneys fees.

I.
This case is a vivid example of the "not in my backyard" syndrome and efforts taken by some residents to ensure that state agencies comply with this State's rules when taking actions which might clear the way for the opening of a hazardous waste facility in their community. The plaintiffs, residents of Noxubee County, first engaged in a battle with the Mississippi Environmental Protection Council ("EPC"), an advisory and study board consisting entirely of legislators. The battle erupted on December 2, 1992, when the EPC noticed a meeting for December 17, 1992, regarding its recommendations to the Governor of the State of Mississippi on the 1992 revision to the State's Capacity Assurance Plan (CAP).
The CAP is Mississippi's 20-year plan for dealing with hazardous waste treatment, storage, and disposal in this state. Under 42 U.S.C. § 9604(c)(9) the adoption of a CAP and acceptance thereof by the President of the United States is a prerequisite for receiving non-emergency federal remedial action funding after October 17, 1989. To qualify for federal funding, each state must assure the U.S. Environmental Protection Agency (EPA) that it has adequate capacity to manage, treat, store and dispose of hazardous waste produced within its borders over a 20-year period. See 42 U.S.C. § 9604(c)(9).
In 1988 the legislature created the EPC to study and make recommendations to the legislature in the area of hazardous waste management and disposal needs and the state's responsibilities under federal environmental legislation. In 1989 the legislature vested EPC with power under Mississippi Code Annotated § 49-29-7(f) (1972) "[a]fter holding a public hearing, finalize the recommendations on the state's [CAP], on behalf of the Mississippi Legislature, and to submit the recommendations to the Governor for inclusion in the state's [CAP]."
Acting under this authority, the EPC on December 2, 1992, published a notice of a December 17, 1992, public hearing in the Clarion-Ledger to receive comments on the State's 1992 CAP. The following day, the EPC approved a draft recommendation of the 1992 CAP and distributed it to the public on December 4, 1992.
After first writing the EPC in an attempt to have notice of at least 30 days and after asking the Attorney General to intervene under the APL and Open Meetings Law, all to no avail, Thomas sought a temporary restraining order in the Chancery Court of Hinds County to restrain and enjoin the EPC from holding a public hearing on December 17, 1992. The EPC responded with a motion to dismiss, suggesting that the relief requested was in the nature of mandamus and that, therefore, the action should be brought in circuit court. The chancellor agreed and transferred the matter to circuit court. On December 16, 1992, the circuit court granted a temporary restraining order for ten days, unless the matter was sooner heard, and on the same day, on the joint motion of the parties, granted an extension of the TRO until ten days after December 25, 1992, unless sooner heard. On December 28, 1992, the trial court granted a preliminary injunction prohibiting the defendants from taking any action on the draft CAP of the EPC without first conducting a public hearing. A hearing on the motion was scheduled for February 23, 1993.
On January 6, 1993, however, the governor sent the 1993 revision of CAP to the United *839 States Environmental Protection Agency in Washington, D.C. After the governor submitted the CAP to the EPA, Thomas asked the attorney general to commence a proceeding by writ of mandamus against the governor. He declined.
The governor's action prompted Thomas to join the governor as a party. In his amended complaint, Thomas alleged that the governor engaged in rulemaking under State law, and he violated Thomas' rights to take part in the rulemaking process under the State Administrative Procedures Law, because he failed to give notice of his plans to adopt the CAP before its submission to the EPA. In a third amended complaint, Thomas sought a declaration that the 1990 CAP submitted to the EPA by then Governor Mabus was also void as the product of an unconstitutional body.
In their second amended complaint, Thomas joined the State Department of Environmental Quality and the Environmental Quality Permit Board in an effort to prevent using the allegedly void CAP. The DEQ is charged with the overall responsibility of conserving, managing, developing and protecting the natural resources of Mississippi. Miss. Code Ann. § 49-2-7 (Supp. 1994). The Permit Board has the exclusive authority to issue, modify, revoke or deny permits to control or prevent the discharge of pollutants into the air and waters of the State. Miss. Code Ann. § 49-17-28 (Supp. 1994). It is composed of nine people, seven of whom are environmental professionals from various state agencies. These seven are the only ones authorized to vote with respect to hazardous waste permits. The DEQ staff serves the Permit Board administratively in drafting permits that comply with state and federal regulations and are protective of the environment. Miss. Code Ann. § 49-17-29(3)(b) (Supp. 1994)
As a part of its permitting process, the Permit Board is statutorily directed to assess need and, in doing so, to consider five factors, the first of which is "[t]he extent to which the proposed commercial hazardous waste management facility is in conformance with the Mississippi Capacity Assurance Plan [CAP] and any interstate or regional agreements associated therewith." Miss. Code Ann. § 17-17-151 (Supp. 1993). The 1990 CAP was being utilized for this purpose.
A two-day trial was held on Thomas' motion for a permanent injunction. The trial judge invited both sides to submit post-trial briefs. The trial court subsequently ruled:
1. The EPC and Section 49-29-7(f) were unconstitutional under the separation of powers provision of the State Constitution.
2. The 1990 and 1992 CAPS had both been adopted as a result of the unconstitutional process established by Section 49-29-7(f), and those CAPS were illegal and void ab initio.
3. By acting on the EPC's proposed CAP, Governor Fordice had engaged in rulemaking and had violated the State APL.
4. The DEQ and Permit Board were enjoined from reviewing hazardous waste permit applications under the illegal and void 1990 and 1992 CAPS.
The trial court subsequently denied Thomas' request for attorney fees. This appeal and cross-appeal followed raising the issues noted below.

II.

1. Whether the Governor is subject to either a declaratory or coercive judgment in the courts of this State.
The governor contends that the doctrine of sovereign immunity deprived the circuit court of any jurisdiction over him in this litigation. The governor relies on Lowndes County, Dist. 5 v. Mississippi State Highway Comm'n, 220 So.2d 349, 351 (Miss. 1969), Grantham v. Mississippi Dept. of Corrections, 522 So.2d 219, 222 (Miss. 1988), Miss. Code Ann. § 11-46-3(1). The governor is mistaken, and his reliance on Lowndes and Grantham is misplaced. Suffice it to say that Lowndes and Grantham dealt with immunity for tort damages against the state and its agencies in the absence of express permission by a statute. Likewise, the governor's reliance on Miss. Code Ann. § 11-46-3(1) also is of no avail, as that statute is a part of the state governmental immunity and tort claims act. Thomas' claim is not based *840 on tort damages under § 11-46-3(1), which provides:
[T]he "state" and its "political subdivisions," as such terms are defined in Section 11-46-1, shall not be liable and shall be immune from suit at law or in equity on account of any wrongful or tortious act or omission, ... notwithstanding that any such act or omission constitutes or may be considered as the exercise or failure to exercise any duty, obligation or function of a governmental, proprietary, discretionary or ministerial nature.
This act was a direct response to Pruett v. City of Rosedale, 421 So.2d 1046 (Miss. 1982), and should not be construed to immunize governmental authorities and agencies from suits other than for money damages. Consequently, the governor's claim that the doctrine of sovereign immunity bars this action against him must fail.
This Court has repeatedly held that our courts have the power to hear claims that public officials have violated their mandatory, non-discretionary duties of office. Poyner v. Gilmore, 171 Miss. 859, 158 So. 922 (1935). In Poyner this Court stated that, "While no inflexible rule can be laid down for determining in every case whether or not an act of a public officer is ministerial or judicial, `the most important criterion, perhaps, is that the duty is one which has been positively imposed by law and its performance required at a time and in a manner or upon conditions which are specifically designated, the duty to perform under the conditions specified not being dependent upon the officer's judgment or discretion... .'"
The governor argues that the only recourse the plaintiffs had was to seek a writ of mandamus. As the governor correctly pointed out, a writ of mandamus will not lie against the governor. Vicksburg R. Co. v. Lowry, 61 Miss. 102, 103 (1883).
While it is true that a writ of mandamus will not lie against the governor, the governor does not cite any authority which prohibits the governor from being named as a party in a lawsuit. In the instant case, the plaintiffs below did not seek a writ of mandamus or injunctive relief against the governor. The governor was not compelled to do anything and he was not enjoined from doing anything, the trial court merely issued a declaratory judgment. Miss.Rule Civ.Pro. 57(b)(1) provides:
Any person interested under a deed, will, written contract, or other writings constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise, and obtain a declaration of rights, status or other legal relations thereunder.
We hold that the trial court had the power to declare whether the plaintiffs below had a right under this state's APL to offer comments before the adoption of a CAP.

2. JURISDICTION OVER PLAINTIFFS' CLAIMS PROPERLY RESIDES IN THE CHANCERY COURT OF NOXUBEE COUNTY AFTER COMPLETION OF ADMINISTRATIVE PROCEEDINGS.
The governor and DEQ argue that the Circuit Court of the First Judicial District of Hinds County did not have subject matter jurisdiction over the matters contained in the complaint. The governor's assertion rests on the fact that persons directly affected by the Permit Board's granting of a hazardous waste facility permit can appeal its decision to the chancery court in the county where the facility will be located. Hence, he argues that Thomas can bring suit in Noxubee County when and if the Permit Board grants a permit for a facility to be built.
The governor's contention ignores the fact that this case is not about the Permit Board's grant or denial of a hazardous waste facility permit. Rather, the issue before the trial court was Thomas' right to seek relief where the EPC and then the governor failed to give the public an opportunity to offer comments before the adoption of the CAP in accordance with the Administrative Procedures Law. Miss. Code Ann. § 25-43-7 provides:
Prior to the adoption, amendment or repeal of any rule, the agency shall give at *841 least thirty (30) days' notice of its intended action. The notice shall include a statement of either the terms or substance of the intended action or a description of the subjects and issues involved, and the manner in which interested persons may present their views thereon. The notice shall be filed with the office of the secretary of state and mailed by the agency to all persons who have made timely request of the agency for advance notice of its rule-making proceedings. The secretary of state shall furnish copies at the request of any person and shall be reimbursed by the requesting person for the expense of providing such service.
The EPC and then the governor failed to comply with § 25-43-7. Miss. Code Ann. § 25-43-7(3) states:
No rule hereafter adopted is valid unless adopted in substantial compliance with this section. A proceeding to contest any rule on the ground of non-compliance with the procedural requirements of this section must be commenced within one (1) year from the effective date of the rule.
This statute plainly suggests that Thomas does not have to wait until the Permit Board uses the rule in reviewing an application. Instead, the statute gives Thomas a right to bring suit at any time within one year of the effective date of the rule. Here, the CAP was adopted by the governor on January 6, 1993. Thomas sought to contest the rule shortly thereafter. Since the Constitution or the statute did not vest jurisdiction in a particular court, the circuit court had the authority under our Constitution and the State Bill of Rights to entertain such a suit. Miss. Const. § 156 (1890) provides that "the circuit court shall have original jurisdiction in all matters civil and criminal in this State not vested by this Constitution in some other court." Moreover, plaintiffs call to the court's attention Miss. Const. § 24 (1890), which provides that "every person for an injury done him in his lands, goods, person or reputation shall have remedy by due court of law," and § 25 which provides that "no person shall be debarred from prosecuting ... any civil action cause before any tribunal in the state."
In Van Slyke v. Board of Trustees of Institutions of Higher Learning, 613 So.2d 872 (Miss. 1993), this Court observed that the constitution of this state does not impose the same "standing" requirements as the United States constitution and that a private citizen has the right to challenge unlawful governmental action. 613 So.2d at 876. While the challenge there concerned constitutional violations, the decision stands for the proposition that citizens may challenge governmental actions contrary to law where the action would otherwise escape challenge. Id. at 875.
We hold that the plaintiffs had a right to bring suit and the Circuit Court of Hinds County had the power to entertain that suit to determine whether the plaintiffs had a right to offer comments on the CAP and whether the CAP was invalid.

3. THE CIRCUIT COURT ERRED IN DETERMINING THAT THE GOVERNOR IS AN "AGENCY" AND THE CAP A "RULE" UNDER THE MISSISSIPPI ADMINISTRATIVE PROCEDURES LAW.
Governor Fordice argues that the APL applies to "rules" issued by "agencies." More specifically, he contends that the CAP is not a rule, and the governor, in proposing it, did not act as a agency. Before reaching the cases cited by the parties, this Court should consider Miss. Code Ann. § 25-43-3(a). It states:
"Agency" means each state board, commission, department or officer, other than the legislature and the courts, authorized by law to make rules or to determine contested cases. (Emphasis added).
This Court has never addressed the question of whether the governor of Mississippi is an "agency" under this State's APL. However, a careful reading of § 25-43-3(a) suggests that "agency," as there defined, includes the governor. The statute, expressly excludes the Legislature and the courts, but it does not exclude the governor. If the Legislature had not intended for the governor to be considered an agency, it could easily have said so. We read the plain language *842 of the statute and hold that the governor is an agency under the APL.
Governor Fordice argues that there is no Mississippi legislation which directs the governor to propose a CAP and that he should be considered an "agency" only when the law which authorizes him to act is a Mississippi statute.
While there is no express authorization for the governor to propose a CAP, there is an indication in Miss. Code Ann. § 49-29-7 that indicates that the governor would be responsible for proposing the plan in that it expressly directed the EPC to make a recommendation to the governor with respect to the plan. Section § 49-29-1 et seq. has been declared unconstitutional. However, when it was enacted § 49-29-7(f) provided that the EPC would:
after holding a public hearing, finalize the recommendations on the state's Capacity Assurance Plan required under Section 104(k) of the Superfund Amendments and Reauthorization Act (SARA) of 1986, Public Law 99-499, on behalf of the Governor for inclusion in the state's Capacity Assurance Plan.
Although nebulous, the governor's authority to propose the CAP grew out of state law rather than federal law. Governor Fordice claims that the federal law required the governor to propose a CAP. There is nothing in 42 U.S.C. § 9604(c)(9) that requires the governor to propose a CAP to EPA. Rather, the submission and approval of a CAP from the "state" is a prerequisite for receiving federal funds to assist in the cleanup of hazardous waste sites under the Superfund program.
Governor Fordice also argues that no court of any state has ever issued a judgment against its governor declaring him to be an agency under state law. He cites Hall v. Tirey, 501 P.2d 496 (Okla. 1972), for the proposition that Oklahoma's APL did not include the governor as an agency. In Hall, however, the court did not deal with the question of whether the governor was an agency under Oklahoma's APL. Rather, the question was whether the governor had the authority under APL to remove members of quasi-legislative and quasi-judicial administrative bodies. The Hall Court held that "absent a specific legislative enactment subjecting removal actions of the Governor to the Administrative Procedures Act, 75 O.S. 1971 § 301 et seq., we do not believe the Act applies to removals by the Governor." Hall concerned the application of APA to removals by the governor. It does not aid us in interpreting our statute with regard to the instant circumstances.
Thomas, on the other hand, cites two cases for the proposition that two Supreme Courts have held that the governor was an "agency" and as such must comply with their State's APL Acts. In Ex parte Traylor Nursing Home, Inc., 543 So.2d 1179, 1186 (Ala. 1988), the Alabama Statewide Health Coordinating Council adopted an amendment to the state health plan regarding the authorization of swing beds in hospitals. The amendment was then forwarded to the governor for approval, and it became effective on July 16, 1985. Traylor challenged the amendment to the state health plan on the ground that the health council failed to follow the procedural requirements set forth in the AAPA.
After first determining that the health council was an "agency," the court stated that if the health council adopted the rule and the governor merely approved it, the health council would be required to comply with the AAPA. On the other hand, the court reasoned that if the health council only recommended passage of the proposal to a state agency or the governor, the governor or the state agency would be responsible for complying with the AAPA. Although the court did not explicitly state that the governor of Alabama was an agency, its dicta seems to imply that the governor was an agency. 543 So.2d at 1186.
Plaintiffs also cite Agrico Chemical Co. v. State, 365 So.2d 759, 763 (Fla.App. 1979), where the Florida court considered an action which had been approved by the governor and his cabinet. The court concluded that the approval was "premature" under the administrative procedures scheme.
Fordice also argues that the CAP was not a "rule," but an offer to make a contract. Moreover, he contends that the CAP does *843 not become a rule until it is accepted by the President and the State becomes bound by it. We reject this contention because for all intents and purposes, there was nothing left to be done by the State of Mississippi once the governor submitted the plan to the president, and thus the CAP was a rule of the State of Mississippi, which the President had the option of accepting or rejecting for Superfund law purposes. Regardless of whether the President had yet accepted the CAP, the Permit Board, as statutorily directed, was following the 1990 CAP as adopted in its permitting process. Thus, the CAP is a "rule."

4. WHETHER THE TRIAL COURT ERRED IN DENYING THE GOVERNOR'S MOTION TO DISMISS FOR FAILURE TO JOIN INDISPENSABLE PARTIES PURSUANT TO MISS. R.CIV.P. 19.
Fordice argues that the trial court erred in overruling his motion to dismiss for failure to join indispensable parties, because certain applicants for hazardous waste disposal permits were indispensable parties and should have be joined, if feasible. The governor's contention is founded on Miss. R.Civ.P. 19(a)(2). It states:
(a) Persons to Be Joined if Feasible. A person who is subject to the jurisdiction of the court shall be joined as a party in the action if:
* * * * * *
(2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.
If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant or, in a proper case, an involuntary plaintiff.
Holnam, Inc., and Hughes Environmental Systems  Federated Technologies of Mississippi, Inc. (Hughes) attempted to intervene in this litigation. Holnam, Inc. withdrew its motion to intervene. Hughes' motion was denied, and it did not appeal. Fordice contends that they were indispensable parties and that regardless of the disposition of their motions to intervene, his motion to dismiss for the failure to join them should have been granted.
While it is true that both proposed parties had pending applications before the Permit Board, they do not appear to have an interest which requires their presence in this litigation.
This litigation in no way challenges the issuance of specific permits by the Permit Board. Rather, it challenges the governor's authority to adopt a CAP, assuming the CAP is a rule, without public input as required by APL. The fact that the parties have filed applications does not give them an interest in this litigation. See Krueger v. Morton, 539 F.2d 235, 238 (D.C. Cir.1976); see also Oregon Environmental Council v. Department of Environmental Quality, 775 F. Supp. 353 (D.Or. 1991). Citing Duesing v. Udall, 121 U.S.App.D.C. 370, 372-73, 350 F.2d 748, 750-51 (1965), the Krueger Court held that an application does not acquire a vested interest by merely filing an application for a permit.
The United States Court of Appeals for the Ninth Circuit has treated parties in a similar posture. In Northern Alaska Environmental Center v. Hodel, 803 F.2d 466 (9th Cir.1986), that court held that a trial judge is not obliged to join a party to a law suit under Rule 19(a)(2) where such a party does not possess the "requisite legally protected interest in the subject matter."
There the National Park Service (NPS) was enjoined from approving mining plans and access permits in Alaska's national parks until NPS fully complied with the National Environmental Policy Act. The government moved to join as necessary parties under Federal Rules of Civil Procedure 19(a) all miners who had submitted operations plans to the NPS. Id. at 468. The government argued that the injuries suffered by "these persons could not be articulated adequately by others and that failure to name the defendants *844 subjects them to substantial risks of inconsistent obligations and that the joinder was feasible. Id. The Court of Appeals held that the interest requirement of Rule 19(a)(2) had not been satisfied and therefore the factors 19(a)(2)(i) and (ii) need not be addressed. Id. Specifically, the court held that "miners with pending plans have no legal entitlement to any given set of procedures." Id. at 469.
Even if the applicants did have a legally protected interest, this Court is not obligated to reverse the case. An appellate court can preserve "the case by modifying the relief so the abuse can be avoided." Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 111-112, 88 S.Ct. 733, 739, 19 L.Ed.2d 936 (1968). See, Clarkson Co. v. Shaheen, 544 F.2d 624, 628 (2d Cir.1976) (The Provident Tradesmens case requires in general that a flexible approach be taken to issues relating to Rule 19 questions). In any event, because we now, as fully set forth in the section which follows, vacate that portion of the order of the trial court enjoining the Permit Board, the failure to have joined Holnam and Hughes, if erroneous, is cured.

4. WHETHER THE TRIAL COURT ERRED BY ENTERING AN INJUNCTION PROHIBITING THE MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY AND THE MISSISSIPPI ENVIRONMENTAL QUALITY PERMIT BOARD FROM PROCEEDING WITH ANY PERMITTING PROCEDURES REGARDING HAZARDOUS WASTE TREATMENT FACILITIES, RATHER THAN ENJOINING ONLY THE PORTION OF THOSE PROCEEDINGS INVOLVING THE INVALIDATED CAPACITY ASSURANCE PLAN.
Governor Fordice, as well as DEQ and the Permit Board, argues that the injunction entered in this case exceeded the scope of this litigation. They argue that the injunction should be modified so that DEQ and the Permit Board can complete tasks necessary for processing hazardous waste treatment facility applications that do not involve the use of the CAP.
In issuing the injunction, the court reasoned that DEQ and the Permit Board could not process applications because § 17-17-151(3) requires, as one part of a five-part analysis, that the permits be evaluated for compliance with the CAP.
Miss. Code Ann. 17-17-151(3) provides:
The Permit Board shall consider the following factors in evaluating the need for the proposed facility:
(a) The extent to which the proposed commercial hazardous waste management facility is in conformance with the Mississippi Capacity Assurance Plan and any interstate or regional agreements associated therewith;
(b) An approximate service area for the proposed facility which takes into account the economics of hazardous waste collection, transportation, treatment, storage and disposal;
(c) The quantity of hazardous waste generated within the anticipated service area suitable for treatment, storage or disposal at the proposed facility;
(d) the design capacity of existing commercial hazardous waste management facilities located within the anticipated service area of the proposed facility; and
(e) the extent to which the proposed facility is needed to replace other facilities, if the need for a proposed commercial hazardous waste management facility cannot be established under paragraphs (a) through (d).
The governor, DEQ, and the Permit Board, argue that only one of the factors involves the use of the CAP, DEQ and the Permit Board should be allowed to proceed with the permitting processes, as it relates to the non-CAP factors. This argument appears to have merit. While it is true, as plaintiffs assert, that information in the CAP and the criteria for permitting overlap, it is clear that there are statutory tasks to the process which are independent of the existence of a CAP. That the CAP reflects those same tasks is a function of the fact that the CAP itself is an agreement to do what the statute authorizes. In other words, the CAP reflects the comprehensive state plan. The state plan is also reflected by a series of statutes assigning particular tasks. Except to the extent that they are statutorily circumscribed, *845 the assigned agencies perform those tasks without regard to the CAP. The Permit Board in particular is directed to perform tasks, one of which involves a consideration of the CAP itself as opposed to the independent elements which comprise the CAP. It is the CAP which is challenged, not the elements reflected therein, statutory or otherwise. It follows that an injunction which goes beyond use of the CAP is overbroad.

5. SHOULD THIS COURT ADOPT THE PRIVATE ATTORNEY GENERAL RULE AS A BASIS FOR AWARDING ATTORNEYS' FEES WHERE, AS HERE, PLAINTIFFS HAVE BEEN COMPELLED TO BRING A LEGAL ACTION VINDICATING IMPORTANT PUBLIC, CONSTITUTIONAL AND STATUTORY RIGHTS, THEREBY, AS THE TRIAL COURT EXPRESSLY FOUND, HAVING "SECURED A SUBSTANTIAL BENEFIT FOR THE STATE?"
The trial court denied Thomas' request for attorneys' fees. In denying Thomas' request the trial judge cited Grisham v. Hinton, 490 So.2d 1201 (Miss. 1986). In Grisham, this Court reversed the trial court's award of trial expenses, including attorneys' fees. This Court stated:
"With the sole exception of punitive damages cases, in the absence of contractual provision or statutory authority therefor, this Court has never approved awarding trial expenses and attorney's fees to the successful litigant. It has consistently been our view that such expenses are not allowable as parts of the costs."
Governor Fordice argues that the doctrine of stare decisis requires that the lower court be affirmed on the cross-appeal.
While it is true that this Court is bound by the doctrine of stare decisis, the posture of this case is different from Grisham. In that case, the parties to the litigation were all private parties and the dispute concerned a trespass action. Rather, this suit involves several citizens of Noxubee County and their effort to ensure that the State of Mississippi and its agents follow State law in adopting the CAP. Thus, it may be said that Thomas performed a public service.
Thomas cites three cases for the proposition that plaintiffs are entitled to attorney's fees where they render public services. See, Pearl River Valley Water Supply District v. Hinds County, 445 So.2d 1330 (Miss. 1984); Smith v. Dorsey, 599 So.2d 529 (Miss. 1992) and Richardson v. Canton Farm Equipment Inc., 608 So.2d 1240 (Miss. 1992).
In Pearl River, two counties and an individual taxpayer sought to enjoin the defendant from, among other things, using the proceeds of a special tax levy for unauthorized purposes. The trial court awarded the plaintiffs $70,204 in attorney's fees even though they did not seek punitive damages or bring suit under a statute authorizing fees or costs.
This Court remanded the issue of attorney's fee to the trial court, stating:
"If the court should find that the District has violated the District Laws or exceeded its authority and enjoins the District from future violations, then, in that event, the court may award attorney's fees for cross-appellants that seem just and proper under the circumstances."
This Court did not state its reasoning behind its assertion that the plaintiffs might be entitled to attorney's fees on remand. Thomas relies on then Justice Hawkins' dissent for a rationale. In his dissent, the Justice Hawkins stated:
"Under my view of the case, however, the chancellor was manifestly correct in awarding reasonable attorneys fees. The plaintiff counties have rendered an incalculable service to all five counties. As a result of their suit, they will be stopping bad management, the waste and dispersion of public funds. Well over a million dollars in the Property Improvement Fund is preserved for the District, rather than been dissipated on some private ventures."
Contrary to Thomas' contention that the plaintiffs were entitled to attorney's fees because they performed a public service, Justice Hawkins stated that Miss. Code Ann. § 11-53-37 was the statutory authority for *846 the chancellor's award of attorneys fees in Pearl River. Id. at 1362.
Suffice it to say § 11-53-37 does not deal with public service litigation. It states:
Where a party hereafter institutes a suit for the benefit of himself and all others similarly situated, and thereby there is in such suit recovered or preserved property or a fund for the common benefit, the chancery court may make an allowance to such party of the reasonable costs incurred, which costs shall include the necessary disbursements, and reasonable solicitor's fees, out the property recovered or preserved for the common benefit.
Thomas also cites Smith as authority for awarding attorney's fees in public interest lawsuits. In dicta, this Court stated:
We consider this case to be the classic public interest lawsuit, where the plaintiffs at great trouble and expense have rendered an invaluable public service by bringing the wrongdoers to account.
However, this Court's affirmance of the chancellor's award of attorney fees appears to have been based on the fact that the chancellor awarded punitive damages. The Court observed: "Additionally, this court has analogized an allowance of attorneys' fees to the grant of punitive damages. Absent statutory authority or contractual provisions, attorneys' fees cannot be awarded unless punitive damages are also proper." Id. at 550.
In Richardson this Court affirmed the chancellor's allowance of attorneys' fees based upon the conclusion that an award of penal damages was the functional equivalent of an assessment of punitive damages.
Although the plaintiffs in this case may have performed a public service, the trial court did not award punitive damages and there was no statutory authority for attorneys' fees. As such, the trial court did not err in denying Thomas' request for attorney's fees.
Thomas attempts to get around this bar, by arguing that because they secured a substantial benefit for the state they are entitled to attorney's fees under the "private attorney general rule." Mississippi has not adopted the "private attorney general rule" and this court declines to do so in these circumstances.

6. THE CIRCUIT COURT'S FINDING THAT DEFENDANTS ENTERTAINED A REASONABLE BELIEF THAT THEIR ACTIONS WERE PROPER IS CLEARLY ERRONEOUS; MISSISSIPPI LAW AUTHORIZES AN AWARD OF ATTORNEYS' FEES IN THIS CASE.
Thomas argues that Mississippi has long recognized that punitive damages are appropriate where a defendant's conduct is wanton, oppressive, grossly negligent, or intentionally wrongful and that trial court's finding that the governor entertained a reasonable belief that his actions were proper is not supported by the substantial evidence and therefore should be reversed. Thomas cites McAdory v. McAdory, 608 So.2d 695, 699 (Miss. 1992). It should suffice to say that at the time that the governor acted, he was not subject to an injunction and he had at least arguable statutory authority to submit a CAP. The EPC proposed recommendation was a public document, at least arguably available for his use. The trial court's conclusion is supported by substantial evidence.

7. PLAINTIFFS ISSUED AND SERVED A TRIAL SUBPOENA DUCE TECUM AND RULING THAT TAGGART WAS NOT REQUIRED TO TESTIFY ON THE GROUNDS OF EXECUTIVE PRIVILEGE, THEREBY WARRANTING A REMAND TO ENABLE PLAINTIFFS TO DEVELOP A COMPLETE RECORD ABOUT THEIR ENTITLEMENT TO ATTORNEYS' FEES?
Plaintiffs suggest that if the record as to the propriety of attorneys' fees is deemed insufficient. Then this court should decide whether plaintiffs were deprived of the opportunity to have made a sufficient record by the refusal of the trial court to issue a subpoena duces tecum on the governor's administrative assistant. Because we find a substantial basis in the record for the conclusion that the governor had an arguable basis for acting in disregard to an injunction not directed at him this Court need not reach the issue of supposed executive privilege.

*847 III.
For the foregoing reasons the judgment of the circuit court is affirmed in all respects, except the breadth of the injunction and this matter is remanded to that court for entry of a judgment modified to clarify that the DEQ is enjoined from using the 1990 and 1992 CAPs only and in no other respect.
ON DIRECT APPEAL: AFFIRMED IN PART; REMANDED IN PART FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. ON CROSS-APPEAL: AFFIRMED.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, and PITTMAN, JJ., concur.
JAMES L. ROBERTS Jr., J., concurs except as to issue III.
McRAE, J., concurs in results only.
SMITH, J., concurs in part and dissents in part with separate written opinion joined by DAN M. LEE, P.J., and JAMES L. ROBERTS Jr., J.
SMITH, Justice, concurring in part, dissenting in part:
I agree with the majority's reasoning on all issues except the decisive Section II; Issue 3. Prior to Judge James Grave's opinion and order of June 8, 1993, no trial court, much less this Court had ever held that the Governor of Mississippi was an "agency." Now for the very first time, a majority of this Court affirms Judge Graves, relies on admitted dicta from other jurisdictions, and declares that the Governor and his office is an "agency." Unbelievably, even the dicta fails to support the majority's position. Because the majority opinion fails to respect the separation of powers between the three branches of government and the constitutional position of the Governor, I am compelled to dissent.
The majority asserts that Miss. Code Ann. § 25-43-3(a), which defines "agency," includes the Governor of Mississippi. While the statute expressly excludes the legislature and the courts, it does not exclude the Governor, thereby, reasons the majority, the office of the Governor falls within the purview of the statute. Section 25-43-3(a) reads as follows:
"Agency" means each state board, commission, department or officer, other than the legislature and the courts, authorized by law to make rules or to determine contested cases.
The majority relies upon two cases that it claims perhaps stand "for the proposition that two state supreme courts have held that the Governor was an `agency' and as such must comply with their State's APL Acts." Majority Opinion at 842 See Ex parte Traylor Nursing Home, Inc., 543 So.2d 1179, 1186 (Ala. 1988), and Agrico Chemical Co. v. State, 365 So.2d 759, 763 (Fla.App. 1979). In fact, neither case holds that the Governor has been determined to be an agency under either state's Administrative Procedure Act. That issue was neither addressed nor considered by the respective courts of our sister states.
Although no previous court in Mississippi has held the Governor of Mississippi or his office to be an "agency," three different Attorneys General of Mississippi have consistently rendered opinions stating that a state entity is not an agency under the APL, unless it decides "contested cases" as defined by Miss. Code Ann. § 25-43-3(b), (1992). The majority ignores the consistent interpretive opinions of the Attorneys General. In Winston County v. Woodruff, 187 So.2d 299, 302 (Miss. 1966), this Court opined that the Attorney General's consistent construction of the statute is entitled to significant weight in this Court.
The United States Supreme Court recently defined "agency," as stated in the Federal Administrative Procedures Act, and settled the question as to whether the President of the United States is an agency under the guidelines of the Federal Administrative Procedures Act. In Franklin v. Massachusetts, ___ U.S. ___, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), the Commonwealth of Massachusetts and two registered voters sued the Secretary of Commerce regarding the process in which the Secretary determined census figures of state populations. These figures are sent to the President who then sends the numbers to Congress to allocate *848 the seats in the House of Representatives. The plaintiffs argued that the Secretary included overseas federal employees in the populations of various states. This caused Massachusetts to lose a seat in the House. Terming the act as arbitrary and capricious in the lower court, the U.S. Supreme Court reversed.
The Supreme Court stated the core issue was "whether the `final' action that appellees have challenged is that of an `agency' such that the federal courts may exercise their powers of review under the APA." ___ U.S. at ___, 112 S.Ct. at 2773. The Court stated that the final act is important because the President's duties are not "merely ceremonial or ministerial." "Thus, we can only review the APA claims here if the President, not the Secretary of Commerce, is an `agency' within the meaning of the Act." Id. at ___, 112 S.Ct. at 2775. The Court illustrated a very important concept that affects and should determine the issue in the case at bar. The Court noted the APA definition of "agency" as:
each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include  (A) the Congress; (B) the courts of the United States; (C) the governments of the territories or possessions of the United States; (D) the government of the District of Columbia.
Id., citing 5 U.S.C. § 701(b)(1), 551(1). The Supreme Court noted the President is "not explicitly included" but:
[o]ut of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA. We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion.
Id.
Returning to the case at bar, an examination of § 25-43-3(a) reveals that the Governor was not expressly included, as was the President in Franklin. Accordingly, this Court should hold that the Governor or his office is not an "agency."
The majority relies upon Ex parte Traylor Nursing Home, Inc., 543 So.2d 1179 (Ala. 1988) to support the argument that the Governor is an agency. This is an incorrect reading of this case as the facts illustrate. In Traylor, a nursing home sued the Statewide Health Coordinating Council alleging a violation of the Administrative Procedures Act in adopting an amendment to the state health plan. Traylor wanted to determine whether the amendment to the state health plan constituted a "rule" within the definition of the Alabama Code 1975, § 41-22-3(9). Id. at 1180. The amendment was sent to the Governor for approval, which became effective July 16, 1985. Id. at 1181.
The majority first states that the Alabama Supreme Court determined that the Governor was an agency, but in its very next breath the majority states: "Although the court did not explicitly state that the governor of Alabama was an agency, its dicta seems to imply that the governor was an agency." Majority Opinion at 842-843, citing 543 So.2d at 1186. This is not an accurate reading of the case since the Alabama Supreme Court went through an in-depth analysis to determine that the Alabama Statewide Health Coordinating Council (health council) was an agency as defined by § 41-22-3(9), and it was required to follow the requirement set forth in the APA. 543 So.2d at 1186.
The court did not even address the issue of whether the Governor was an agency, nor did it remotely intimate such an idea. What the court stated was simply the following:
In addition, the fact that the Governor or the state agency has final approval of the amendment is irrelevant, given the purpose of the AAPA. The AAPA provides a mechanism for both business people and the general public to participate in the development and adoption of rules, regulations, standards, or procedures that affect the public or a specific industry. If the state health care agencies in this state can circumvent the procedural requirements by dividing their powers, then the public *849 lacks the protection the legislature intended it to have.
Finally, if the health council only recommended passage of this proposal to the state agency and the Governor, and they, in turn, adopted the rule, then the state agency and/or the Governor would be the agency responsible for complying with the AAPA. If, on the other hand, for all intents and purposes, the health council adopted the rule and the Governor merely approved it, then the AAPA should have been followed by the health council. In either case, because this is a rule affecting the public's rights, we conclude that there should have been compliance with the AAPA.
Looking at the amendment broadly, with the intent of effectuating the purpose of the AAPA, we conclude that the health council is an agency within the meaning of § 41-22-3(9); therefore, it was required to follow the requirements set forth in the AAPA.
Id. (emphasis added).
Neither the governor nor his office were mentioned again in the opinion and the majority is partially correct in its claim that the reference to the Governor is only dicta.
The majority next cites Agrico Chemical Co. v. State, 365 So.2d 759, 763 (Fla.App. 1979), where the question was whether a rule that was approved by the Environmental Regulatory Commission was properly before the Governor and his cabinet for final action as provided by statute. Nowhere in the opinion is there discussion of whether the Governor is an agency.
Returning to the case at bar, the second part of the issue questions whether the governor's action is in effect "rule making" once he proposed the Capacity Assurance Plan (CAP) to the Environmental Protection Agency in Washington, D.C. The case of Franklin v. Massachusetts, previously addressed in this dissent, is analogous to this issue.
Also, in Morton v. Ruiz, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974), the Supreme Court held that in order to be classified as a "rule," a government's pronouncement must be "binding" or have the "force of law." The proposed CAP does not constitute "law or policy" within the meaning of Miss. Code Ann. § 25-43-3(f). Contrary thereto, 42 U.S.C. § 9604(c)(9) plainly describes the CAP as "a contract or cooperative agreement," and no contract has any force until it is accepted by the other party to be bound. Neither the Mabus CAP or the Fordice CAP has ever been approved or accepted by the Environmental Protection Agency, thus, there is an absence of any "binding" or "force of law." Hence, no rule making was accomplished.
Thomas complained that the Permit Board was required by Miss. Code Ann. § 17-17-151(3)(a) to consult the unaccepted contracts in determining whether to issue a permit. Even if Thomas were correct in such interpretation, the problem lies not with the Governor, but rather with the Legislature which incorporated the proposed CAP into § 17-17-151(3)(a). The CAP only requires that the Permit Board consider four waste management alternatives, including transportation of waste to out-of-state facilities, in making permitting decisions. The CAP plainly states that Mississippi plans to increase its hazardous waste exports from the 1989 level. The CAP does not dictate that any certain facility, or even type of facility, be permitted. Thus, Thomas' quarrel would be with the Legislature, rather than the Governor. However, because § 25-43-3(a), by definition, expressly excludes the acts of the Legislature and the courts from the APL, Thomas simply proceeded against the Governor, who was not explicitly mentioned for exclusion.
The Governor simply incorporated the policy decisions made by the Legislature as stated in § 17-17-153 and § 17-18-1 into the proposed CAP in order to comply with federal law. Governor Fordice and his predecessor Governor Mabus both formulated a CAP in compliance with federal law. The Governor, following the Legislative instructions, used the Legislative policy decisions concerning the placement of a hazardous waste management facility within the state. It is clear that the use of state law and policy decisions of the Legislature in an attempt to fulfill the *850 requirements of federal law does not make the CAP a rule under the APL.
The failure of § 25-43-3(a) to explicitly exclude the governor in defining "agency" is of no great consequence. We should adhere to the Franklin decision wherein the Supreme Court held that "textual silence is not enough to subject the President to the provisions of the APA." Likewise, this Court should determine that textual silence of § 25-43-3(a) is to not enough to hold that the Governor is an agency.
Out of great respect for the separation of powers the constitutional position of the Governor, and for other reasons set out heretofore.
DAN M. LEE, P.J., and JAMES L. ROBERTS Jr., J., join this opinion.