2011 ND 24

**Sarah A. DOLL, Plaintiff and Appellee**

v.

**Andrew D. DOLL, Defendant
and Appellant.**

No. 20100133.

Supreme Court of North Dakota.

Feb. 8, 2011.

426

Timothy P. Hill, Fargo, N.D., for plaintiff and appellee.

Craig M. Richie, Fargo, N.D., for defendant and appellant.

MARING, Justice.

[¶ 1]   Andrew Doll appeals from a judgment awarding primary residential responsibility of the parties' minor children to Sarah Doll, now known as Sarah Claeys, and order denying his motion to amend the judgment.[1]   We conclude the trial court did not clearly err in awarding primary residential responsibility to Claeys. Therefore, we affirm.

I

[¶ 2]   Andrew Doll and Sarah Claeys married on June 22, 2002.   A few months later, Claeys moved out of the marital home and filed for divorce.   A default

---

1.   The Legislative Assembly amended N.D.C.C. ch. 14–09 during the 2009 session.   Effective August 1, 2009, the terms "physical custody" and "visitation" became "primary residential responsibility" and "parenting time."   2009 N.D. Sess. Laws ch. 149, § 4. This case was filed while the prior version of the law was in effect.   Accordingly, we apply the law in effect at the time of filing, but use the terminology of the amended statutes.

judgment granting the parties a divorce was entered on February 10, 2003. In the spring of 2003, the parties reunited, although they never remarried. Claeys subsequently informed Doll she was expecting a child. The child, R.M.D., was born later that year. Doll, who is not the biological father of R.M.D., signed a voluntary paternity acknowledgment and is listed as the father on the child's birth certificate. In 2006, the parties had a second child, D.A.D.

[¶ 3] In the spring of 2008, the parties separated again and Claeys moved out of the parties' home in Moorhead to an apartment in Fargo. Initially, the parties agreed to share residential responsibility of the children on an every-other-day basis. Finding the schedule unstable, however, they later agreed to a three-days-on, three-days-off schedule. In September 2008, Claeys informed Doll she was changing their agreement and assuming primary residential responsibility of the children. Doll was to see the children one night a week and every other weekend and holiday. Doll did not consent to the new arrangement and, consequently, moved for primary residential responsibility of the children in Minnesota. Claeys moved for primary residential responsibility in North Dakota. However, because Claeys' attorney was not licensed to practice in Minnesota, Doll agreed to have the case heard in North Dakota in exchange for a stipulation of his paternity to R.M.D., the parties' oldest child.

[¶ 4] On March 3, 2009, the judicial referee issued an interim order, awarding the parties joint residential and decision-making responsibility. The parties were to share residential responsibility on a weekly basis. In addition, the referee asked each party to submit the name of a custody investigator and share the expense for the appointment. Jason Loos was ap-pointed as the custody investigator. He issued his initial report on July 2, 2009, and found none of the best interests of the child factors favored Claeys, two of the factors favored Doll, and the remaining factors favored both parties. Specifically, Loos found Claeys made false allegations of sexual abuse, in bad faith, against Doll. He further found Claeys was unwilling to foster a relationship between the children and Doll. Accordingly, he recommended Doll be awarded primary residential responsibility of the parties' minor children. On February 5, 2010, Loos issued a supplemental report, this time recommending the parties share both residential and decision-making responsibility.

[¶ 5] A three-day trial took place February 8 - 10, 2010. Both parties testified on their behalf. The trial court also heard testimony from Loos, the parties' friends, and family members. When asked to clarify the change in his 2009 and 2010 recommendations, Loos explained the parties should continue the parenting schedule because they have been able to make it work. On March 8, 2010, the court issued its findings of fact, conclusions of law, and order for judgment, awarding primary residential responsibility of the parties' minor children to Claeys. Doll appeals, arguing the trial court clearly erred by awarding primary residential responsibility of the children to Claeys.

## II

[¶ 6] An award of primary residential responsibility is a finding of fact that will not be reversed on appeal unless it is clearly erroneous. *Molitor v. Molitor*, 2006 ND 163, ¶ 6, 718 N.W.2d 13. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support it, or, although there is some evidence to support it, on the entire record, we are left with a

definite and firm conviction a mistake has been made. *Id.* "Under the clearly erroneous standard, we do not reweigh the evidence nor reassess the credibility of witnesses, and we will not retry a custody case or substitute our judgment for a district court's initial [parenting schedule] decision merely because we might have reached a different result." *Wolt v. Wolt,* 2010 ND 26, ¶ 7, 778 N.W.2d 786.

[¶ 7] In an initial parenting schedule decision, a trial court must award residential responsibility to the parent who will best promote the best interests and welfare of the children. *Wolt,* 2010 ND 26, ¶ 8, 778 N.W.2d 786. "In deciding the children's best interests, the court must consider all relevant factors specified in N.D.C.C. § 14–09–06.2(1)." *Id.* At the time this case was filed, N.D.C.C. § 14–09–06.2(1) [2] outlined the following factors for assessing the best interests and welfare of the child:

a. The love, affection, and other emotional ties existing between the parents and child.

b. The capacity and disposition of the parents to give the child love, affection, and guidance and to continue the education of the child.

c. The disposition of the parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.

d. The length of time the child has lived in a stable satisfactory environment and the desirability of maintaining continuity.

e. The permanence, as a family unit, of the existing or proposed custodial home.

f. The moral fitness of the parents.

g. The mental and physical health of the parents.

h. The home, school, and community record of the child.

i. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.

j. Evidence of domestic violence....

k. The interaction and interrelationship, or the potential for interaction and interrelationship, of the child with any person who resides in, is present, or frequents the household of a parent and who may significantly affect the child's best interests. The court shall consider that person's history of inflicting, or tendency to inflict, physical harm, bodily injury, assault, or the fear of physical harm, bodily injury, or assault on other persons.

l. The making of false allegations not made in good faith, by one parent against the other, of harm to a child as defined in section 50–25.1–02.

m. Any other factors considered by the court to be relevant to a particular child custody dispute.

[¶ 8] Although a trial court has broad discretion in awarding primary residential responsibility, the court must consider all of the relevant factors under N.D.C.C. § 14–09–06.2(1)(a)–(m). *Wolt,* 2010 ND 26, ¶ 9, 778 N.W.2d 786. The court need not make separate findings for each factor, but its findings of fact must be stated with sufficient specificity to enable a reviewing court to understand the factual basis for the court's decision. *Molitor,* 2006 ND 163, ¶ 6, 718 N.W.2d 13. In addition, a trial court has discretion "in deciding what weight to assign a custody

---

2. The Legislature amended the factors during the 2009 session; however, they were not in effect at the time of the filing of this action. N.D.C.C. § 14–09–06.2(1) (2009).

investigator's conclusion" and need not follow a custody investigator's recommendation. *Wolt,* at ¶ 9.

[¶ 9] Here, the trial court considered all of the best interests of the child factors and made specific findings for each factor. The court found factors (a), (e), (f), (g), (i), (j), (k), (*l*), and (m) favored neither parent and factors (b), (c), and (h) favored Claeys. The court found that only factor (d) favored Doll.

### III

[¶ 10] Doll argues the trial court clearly erred by failing to consider all of the best interests of the child factors and by giving undue weight to factor (k), failing to consider Claeys' frustration of his parenting time and her parental alienation, and failing to consider how Claeys' "chronic lying, dishonesty, multiple relationships, and manipulation discredited her moral fitness as a parent." After conducting an extensive review of the record, we conclude the trial court's findings of fact are not clearly erroneous.

### A

[¶ 11] Doll argues the trial court erred by failing to consider all of the best interests of the child factors and by giving undue weight to factor (k). The record, however, does not support Doll's argument. In its decision, the trial court made specific findings for each of the factors listed under N.D.C.C. § 14–09–06.2(1)(a)–(m) and the weight each factor had in assessing the best interests of the children.

■ [¶ 12] Under factor (a), the trial court found that both parents loved and cared for their children. The court also found each parent has developed deep emotional bonds with the children. Accordingly, the trial court concluded factor (a) did not favor either party. The record supports the trial court's conclusion.

■ [¶ 13] Under factor (b), the trial court found that while both parents have shown the capacity and disposition to provide the children with love and affection, Claeys has been primarily involved in the education of the children. In particular, the court found Claeys was the parent who enrolled R.M.D. in pre-kindergarten classes and has been responsible for scheduling the parent-teacher conferences. Thus, the court concluded factor (b) slightly favored Claeys. The record supports the trial court's conclusion. At trial, Claeys testified she enrolled R.M.D. in the "Gear Up for Kindergarten" program to prepare her for kindergarten. The record further shows Claeys enrolled R.M.D. in hockey, paid for the registration, purchased the necessary equipment, and attended all of R.M.D.'s practices. Additionally, the record indicates Claeys registered both children for swimming lessons, enrolled D.A.D. in Teeny Kix, a dance class for young children, and was instrumental in ensuring the children attend an Awana's program through a local church where they learned Bible verses. We conclude sufficient evidence exists to support the trial court's findings and, therefore, the court did not err in deciding factor (b) slightly favored Claeys.

■ [¶ 14] Under factor (c), the trial court found that, since R.M.D.'s birth, Doll was the primary financial provider and Claeys was the primary caretaker. The court also found that from September 2008, until the interim order in March 2009, Claeys had primary residential responsibility of the parties' children, which weighed in her favor. During oral arguments on appeal, counsel for Doll incorrectly asserted Claeys deprived Doll of any parenting time during this period. Nothing in the record supports his assertion. On the contrary, while it is undisputed

Claeys unilaterally changed the parties' parenting schedule in September 2008, both Claeys and Doll testified that from September 2008, until the interim order in March 2009, Doll could see the children one night a week and every other weekend and holiday. The trial court heard testimony from both Claeys and Doll regarding the parties' parenting schedule from May 2008 until the interim order in March 2009, and ultimately concluded Claeys was the primary caretaker of the children from September 2008 until March 2009. Because the record supports the trial court's factual finding and because we do not reweigh the evidence or reassess the credibility of the witnesses on appeal, we conclude the trial court did not clearly err in finding factor (c) favored Claeys. *See Molitor*, 2006 ND 163, ¶ 6, 718 N.W.2d 13.

■ [¶ 15] Under factor (d), the trial court found Doll still lives in the parties' home in Moorhead, which has served as the primary residence for the children from 2007 until the parties' separation in May 2008. The court also found Claeys' Fargo apartment provides the children with a safe and satisfactory environment. However, because of the slightly longer period of Doll's residence in the Moorhead home, the court concluded factor (d) slightly favored Doll. Doll does not challenge the trial court's factual findings under factor (d) on appeal and there is nothing in the record indicating the trial court erred in making the findings.

■ [¶ 16] Under factor (e), the trial court found Claeys' past relationships were not a cause of concern because she has been involved in a stable and loving relationship with her current husband since September 2008. The court explained Claeys had begun "a new, more stable chapter in her life," as evidenced by her stable employment, marriage, and commitment to parenthood. At the same time, the court found Doll to be currently unemployed. The record shows Doll lost his employment in August 2009, and was receiving $299 per week in unemployment benefits at the time of trial.

[¶ 17] We have previously stated that under factor (e), we look to "the permanence, as a family unit, of the existing or proposed custodial home." *Eifert v. Eifert*, 2006 ND 240, ¶ 11, 724 N.W.2d 109. "[F]actor (e) uses a forward-looking approach to the stability of the family unit, its interrelations and environment, versus the backward-looking factor (d)." *Id.* The interaction and interrelationships with parents, siblings and relatives are appropriately analyzed under factor (e). *Id.* Here, in discussing the permanence, as a family unit, of the existing or proposed custodial home, the trial court focused on the stability of Claeys' marriage and employment, while noting Doll's current unemployment status. The trial court did not err in discussing Doll's unemployment under factor (e) because the record indicates his unemployment might adversely affect his ability to make payments on his home. Doll explained, however, he was able to make the house payments because he was receiving between $500 and $700 per month in financial help from his parents. Accordingly, the trial court found factor (e) did not favor either party and based on the entire record, we conclude the trial court's finding was not clearly erroneous.

■ [¶ 18] Under factor (f), the moral fitness of each parent, the trial court recognized neither party had a perfect past. Specifically, the court considered Claeys' past relationships, Doll's guilty plea to an interference with a 911 call, and the testimony on Doll's alleged past alcohol abuse. The court concluded, however, that both parties have shown substantial growth and that neither is morally unfit as

a parent. The trial court further concluded any prior alcohol usage by Doll did not affect his present mental or physical health under factor (g) and, therefore, factor (g) favored neither party.

[¶ 19] The trial court found, however, that factor (h), the home, school, and community record of the child, favored Claeys. The court reiterated Claeys has been primarily involved in R.M.D.'s school and extracurricular activities and in D.A.D.'s youth activities. The court noted Claeys has been the parent responsible for enrolling the children in a variety of programs and paying for the majority of the program fees. As we already explained in our discussion of factor (b), the record supports the court's finding that Claeys was the parent primarily involved in the children's school and community activities. Thus, the trial court's findings under factor (h) are not clearly erroneous.

[¶ 20] Additionally, the trial court found factors (i) and (j) favored neither parent. Given the age of the children, R.M.D. was six-years-old at the time of trial and D.A.D. was three, the trial court did not err in finding the reasonable preference of the children is inapplicable and factor (i) does not favor either parent. *See generally, DesLauriers v. DesLauriers,* 2002 ND 66, ¶ 13, 642 N.W.2d 892 (holding that children ages eight and ten at the time of the divorce could be capable of intelligently expressing their preference on parenting schedule). Moreover, although the record shows Doll interfered with a 911 call in 2002 after an incident involving Claeys and Claeys' sister, there is no other evidence of domestic violence between Claeys and Doll. We have stated that N.D.C.C. § 14–09–06.2(1)(j) creates a rebuttable presumption against awarding primary residential responsibility of a child to a perpetrator of domestic violence when "(1) there exists one incident of domestic

violence which resulted in serious bodily injury; (2) there exists one incident of domestic violence which involved the use of a dangerous weapon; or (3) there exists a pattern of domestic violence within a reasonable time proximate to the proceeding." *Dronen v. Dronen,* 2009 ND 70, ¶ 16, 764 N.W.2d 675. Here, Claeys testified that in the midst of an altercation between Doll and her sister, she went into the living room to call the police because Doll would not "back off from [her] sister." She stated that after Doll realized she was calling the police, he went to the living room, "ripped the phone out of the wall and pushed [her] onto the couch." Nothing in Claeys' testimony shows this one incident resulted in a serious bodily injury or involved the use of a dangerous weapon. Therefore, the trial court's conclusion factor (j) favored neither party is not clearly erroneous.

[¶ 21] Doll argues the trial court clearly erred by giving undue weight to factor (k), the interaction and interrelationship of the children with any person who resides in the household and who may significantly affect the children's best interests. Specifically, he alleges the trial court "put too much weight on the stability of [Claeys'] new husband" and ignored her prior instability. The record does not support his argument.

[¶ 22] In its findings under factor (k), the trial court recognized the stability Claeys' new husband has brought to her household. The court described Claeys' new husband as "supportive, nurturing, and stabilizing presence" in the lives of the children. The plain language of factor (k) requires a trial court to consider the interaction and interrelationship of the children with a person who *currently* resides in or is present in the household, not to review a parent's past relationships with individuals not currently present in that parent's life.

In addition, contrary to Doll's assertion, the trial court did not ignore what Doll describes as Claeys' prior instability. The court considered Claeys' past relationships under both factors (e) and (f). The court explained, however, that although somewhat concerning, Claeys' past behavior did not negatively impact her present ability to care for the children. Finally, under factor (k), the trial court also considered the relationship between Doll and a family he had met through his church. The court noted that similarly to the stability and support Claeys' husband provided for the children, Doll's "surrogate" family served as a stabilizing presence in Doll's life and was in no way unfit to be around the children. Accordingly, the court concluded factor (k) did not favor either parent. We cannot see how by concluding factor (k) favored neither parent, the trial court gave undue weight to factor (k). Therefore, we hold the trial court did not err in its findings under factor (k).

[¶ 23] Under factor (*l*), the trial court found Claeys' report of sexual abuse was made in good faith. Specifically, the court emphasized that the report was based on R.M.D.'s statement to Claeys, "D.A.D. was sleeping with daddy naked, isn't that silly." As the trial court correctly noted, nothing in record indicates Claeys fabricated R.M.D.'s statement. The record also supports the trial court's finding Claeys notified the custody investigator about possible sexual abuse because she needed advice on how to proceed and brought D.A.D. to the doctor only because of the advice she received from him. Similarly, she contacted Social Services only because the doctor told her to do so. The trial court found Claeys' explanation about the sexual abuse report both reasonable and credible, leading the court to conclude: "[T]his is not the case of someone relentlessly shopping accusations around trying to find anyone who would listen. Instead, this is the case of a young mother following the recommendations she was given on how to proceed with legitimate concerns that were ultimately shown not to warrant any action." We refuse to reassess the trial court's credibility determination of Claeys' testimony or to reweigh the evidence regarding the sexual abuse report. We conclude the trial court's finding Claeys made the report in good faith is not clearly erroneous.

[¶ 24] Finally, the trial court did not find any additional factors to discuss under factor (m). Factor (m) allows a court to consider "[a]ny other factors ... relevant to a particular child custody dispute." N.D.C.C. § 14–09–06.2(1)(m). Here, the court stated all relevant factors have already been discussed and concluded factor (m) favored neither parent. We have consistently held we will not substitute our judgment for that of the trial court and will not reverse a trial court's finding under the best interests of the child factors merely because we might have reached a different result. *Wolt*, 2010 ND 26, ¶ 7, 778 N.W.2d 786. Accordingly, we hold the trial court did not err in finding factor (m) does not favor either parent.

[¶ 25] Based on our review of the entire record and the trial court's findings of fact, we conclude the trial court did not err by failing to consider all of the best interests of the child factors, as provided in N.D.C.C. § 14–09–06.2(1)(a)–(m). We further conclude the trial court did not err by giving undue weight to factor (k).

B

[¶ 26] Doll argues the trial court erred by failing to consider Claeys' frustration of his parenting time and her parental alienation. Although at the time this case was filed, N.D.C.C. § 14–09–06.2(1) had not yet been amended to spe-

cifically cover parental alienation, Doll argues the trial court should have considered the issue under factor (m) and asserts the court clearly erred by failing to do so.

[¶ 27] We have explained that evidence of parental alienation is a significant factor in determining primary residential responsibility. *Wolt*, 2010 ND 26, ¶ 10, 778 N.W.2d 786. Thus, a parent "who willfully alienates a child from the other parent may not be awarded [residential responsibility] based on that alienation." *Id.* However, based on the evidence presented at trial, we cannot conclude Claeys engaged in the type of willful alienation and frustration of parenting time that would preclude her from having primary residential responsibility of the children.

[¶ 28] Doll testified about two instances in which, he asserts, Claeys interfered with his parenting time. The first instance involved Claeys picking up the children early from day care in September 2008. The second incident Doll testified about involved Claeys showing up at his house twenty minutes before her scheduled pickup time to take the children. We conclude the trial court did not err in failing to find interference with parenting time based on these two incidents.

[¶ 29] In addition, Doll asserts Claeys tried to alienate the children from him by challenging his paternity and threatening to tell R.M.D. he was not her biological father, attempting to exclude him from R.M.D.'s school activities, and making false allegations of sexual abuse against him. In his initial report, the custody investigator discussed the paternity issue under factor (m). The investigator concluded that if awarded primary residential responsibility, Claeys was unlikely to foster a relationship between Doll and the children. He asserted Claeys has tried to challenge Doll's paternity since the beginning of the proceedings and "has unilater-

ally attempted to dictate when [Doll] can see the girls." The custody investigator also noted Claeys did not initially include Doll on the contact sheet for R.M.D.'s kindergarten and instead listed her then-boyfriend, now husband, as R.M.D.'s parent/guardian. Finally, the custody investigator found Claeys' sexual abuse report was not made in good faith and militated against awarding primary residential responsibility of the children to her.

[¶ 30] We have consistently held that a trial court has discretion in deciding what weight to assign a custody investigator's conclusion and need not follow the custody investigator's recommendation. *Wolt*, 2010 ND 26, ¶ 9, 778 N.W.2d 786. We have explained that while a trial court should consider the custody investigator's report, the court should come to its own conclusion. *Id.* Here, the trial court had an opportunity to review both the initial and the supplemental reports filed by the custody investigator. Moreover, the trial court had a chance to question the investigator at trial and ask him to clarify his parenting responsibility recommendation. The investigator explained his recommendation was for the parties to share both residential and decision-making responsibility of the children. However, because a trial court has broad discretion in deciding the weight to be given a custody investigator's recommendations, the court's decision not to follow them is not clearly erroneous.

[¶ 31] The trial court also listened to the testimony of both Claeys and Doll regarding the above-described incidents. Claeys testified she wants the children to have a good relationship with their father and stated her new husband will not replace Doll's role as a father in the children's lives. Claeys further testified that despite her attempts to challenge Doll's paternity in court, she had not told R.M.D. Doll is not her biological father. Addition-

ally, while Claeys admitted she did not initially list Doll on R.M.D.'s kindergarten registration form, she noted she regretted her decision to omit him from the form and realized she was wrong in doing so. Finally, she explained her sexual abuse report was based on R.M.D.'s statement Doll and D.A.D. were sleeping naked together. She stated that in bringing D.A.D. for a medical exam and contacting Social Services, she simply followed the recommendations of the custody investigator and D.A.D.'s treating physician. The trial court found Claeys' testimony regarding the above-mentioned incidents to be both credible and reasonable. On appeal, we give great deference to the trial court's opportunity to observe the witnesses and determine credibility. *Molitor*, 2006 ND 163, ¶ 6, 718 N.W.2d 13. Based on the evidence in the record and given the trial court's credibility determinations, we conclude the trial court did not err by not discussing Doll's allegations of parental alienation against Claeys under factor (m).

### C

[¶ 32] Doll's remaining arguments on appeal focus on what he describes as Claeys' "chronic instability and dishonesty," "multiple relationships," and "manipulation." Specifically, he asserts the trial court erred by failing to consider how Claeys' "chronic lying" and "past instability" affected her moral fitness as a parent. He argues the parties' past relationship, Claeys' subsequent marriage, and the sexual abuse report she filed against him make her a morally unfit parent. As previously discussed, the trial court made specific findings addressing each of Doll's arguments regarding Claeys' past. The court considered Claeys' past relationships under both factors (e) and (f) and found her past instability does not affect her current moral fitness as a parent. On the contrary, the court found Claeys' marriage has been a stabilizing factor in her life and

a positive influence on both her and the children. Additionally, the court found Claeys' sexual abuse report constituted a case of "a young mother following the recommendations she was given on how to proceed with legitimate concerns." We refuse to reweigh the evidence on appeal and we defer to the trial court's opportunity to observe and assess witness credibility. *See Dronen*, 2009 ND 70, ¶ 12, 764 N.W.2d 675. We conclude the trial court's findings Claeys was morally fit as a parent and made the sexual abuse report in good faith are not clearly erroneous.

### IV

[¶ 33] The evidence in the record supports the trial court's findings and we are not left with a definite and firm conviction a mistake has been made. Therefore, we conclude the trial court did not clearly err in awarding primary residential responsibility of the parties' minor children to Sarah Claeys. We affirm.

[¶ 34] GERALD W. VANDE WALLE, C.J., CAROL RONNING KAPSNER, and DANIEL J. CROTHERS, JJ., concur.

DALE V. SANDSTROM, J., concurs in the result.