# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CA-00431-SCT

*MISSISSIPPI DEPARTMENT OF CORRECTIONS*

*v.*

*THE RODERICK & SOLANGE MACARTHUR JUSTICE CENTER*


DATE OF JUDGMENT: 03/06/2015
TRIAL JUDGE: HON. DENISE OWENS
TRIAL COURT ATTORNEYS: ALISON O'NEAL McMINN
PAUL E. BARNES
COURT FROM WHICH APPEALED: HINDS COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT: OFFICE OF THE ATTORNEY GENERAL
BY: PAUL E. BARNES
JASON L. DAVIS
WILSON DOUGLAS MINOR
ATTORNEY FOR APPELLEE: JAMES W. CRAIG
NATURE OF THE CASE: CIVIL - OTHER
DISPOSITION: VACATED AND RENDERED - 04/13/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Adhering to our rule of law, we, the judiciary, should honor and enforce legislatively created exemptions to statutes. "[W]e must presume that the [Mississippi Legislature] meant what it said and said what it meant. . . ."[1] It would be "ludicrous for this Court to blindly follow" the Mississippi Public Records Act of 1983 (MPRA) as it existed in 2014 when the

---

[1] *Deal v. Coleman*, 294 Ga. 170, 172, 751 S.E.2d 337, 341 (2013).

documents at issue were requested and act as though we did not know the law, as adopted by the Legislature in 2016 and readopted in 2017.[2] *See* **Beatty v. State**, 627 So. 2d 355, 358 (Miss. 1993). *See also* **Cellular S., Inc. v. BellSouth Telecomm., LLC**, No. 2016-CA-00034-SCT, 2017 WL 841132, at *6 (Miss. Mar. 2, 2017) ("As a result, absent an applicable saving clause, a final judgment, or a loss to BellSouth of a vested right, we must apply the Public Records Act to the instant case as though it has always read as it reads today."). Accordingly, we vacate the trial court's judgment and render a decision in favor of the Mississippi Department of Corrections (MDOC).

## BACKGROUND

¶2.	MDOC appeals from the Hinds County Chancery Court's order granting the Roderick & Solange MacArthur Justice Center's (Justice Center's) complaint for declaratory judgment, deeming MDOC in violation of the Mississippi Public Records Act (MPRA) and requiring MDOC to produce records sought by the Justice Center. In November 2014, the Justice Center made a request under the MPRA for records pertaining to MDOC's process and protocol for lethal injections, as well as MDOC's acquisition of chemicals it intended or considered for use in lethal-injection executions. MDOC responded to the Justice Center's 2014 request, furnishing documents, some of which were redacted.

¶3.	On December 30, 2014, the Justice Center filed its complaint, seeking an order requiring MDOC to respond completely, without redaction, to the November 2014 request. On January 29, 2015, MDOC filed an answer and counterclaim. MDOC requested that the

---

[2] This statute was amended again by House Bill 638, and this exact language is now found in Section 99-19-51(6)(c). *See* 2017 Miss. Laws H.B. 638.

2

court declare the name(s) and other identifying information concerning the name(s) of the entities that supply the lethal-injection drugs as well as the identities of members of the execution team to be confidential, privileged, or otherwise exempt from the requirements of the MPRA.

¶4. The chancery court heard the case on March 2, 2015. The parties appeared, but neither party offered evidence to support its claims and/or defenses. In its order and opinion, the chancery court concluded that the redacted information neither fell within any of the statutory exemptions provided by the MPRA, nor was it sufficiently sensitive to be sealed and withheld from the public. It ordered the information be disclosed to the Justice Center.

¶5. During the pendency of this appeal, the Mississippi Legislature enacted into law in 2016 Mississippi Code Section 99-19-51(2) (Supp. 2016) and in 2017 Section 99-19-51(6)(c), (2017 Miss. Laws H.B. 638)[3], both of which exempt public bodies from disclosing the "identities of all members of the execution team, a supplier of lethal injection chemicals, and the identities of those witnesses listed in Section 99-19-55(2) who attend as members of the victim's or the condemned person's immediate family . . . under the provisions of the Mississippi Public Records Act of 1983." Miss. Code Ann. § 99-19-51(6). The parties were ordered to supplement their briefs as to what effect a change in the law had on the pending case.[4]

_____

[3] The two versions contain identical language regarding exempting public bodies from disclosure.

[4] The majority acknowledges consent to an order for supplemental briefing, based on both precedent and courtesy. Such consent to a request for supplemental briefing is not indicative of agreement regarding the necessity of same. That said, supplemental briefing

**ANALYSIS**

¶6.     The Legislature of this state, as the principal exponent of the public policy of this state, has declared that the information sought is to be exempted. During the pendency of this matter on appeal, the Legislature has amended the statute twice. First, Senate Bill 2237 was passed and signed into law, *See* Miss. Code Ann. § 99-19-51(2), followed by House Bill 638 in 2017. *See* Miss. Code Ann. § 99-19-51(6)(c), 2017 Miss. Laws H.B. 638.  The legislation specifically expanded the exemptions of the MPRA to include information previously redacted and/or not disclosed by MDOC.[5]

¶7.     Succinctly stated, our review is limited to the actual controversy remaining – what documents, if any, MDOC is required to disclose pursuant to our law.[6] *See **Miss.  Ass'n of Educators v. Trustees of Jackson Mun. Separate Sch. Dist.***, 510 So. 2d 123, 124 (Miss. 1987). As early as on May 3, 2016, there was no obligation for MDOC to disclose documents which would reveal the information first exempted by Section 99-19-51(2) and then by Section 99-19-51(6)(c).[7]

---

created a fresh 270-day deadline, beginning after the bill had passed. Today's opinion is being handed down within the 270 days.

[5]Thus, the question of the legitimacy of the trial court's order is moot. *See **Miss. Ass'n of Educators v. Trustees of Jackson Mun. Separate Sch. Dist.***, 510 So. 2d 123, 124 (Miss. 1987).

[6] As opposed to the dissent's suggestion otherwise, as indicated in separate places in the dissent. *See* Dis. Op. at ¶ 46.

[7] The Justice Center originally took the position that this Court should consider that the 2015 Legislature had the opportunity to change the law in House Bill 1305, but failed to do so. The bill was passed in the House but died in committee in the Senate. The Justice Center averred that the Court should take notice that the failure supported the chancellor's

¶8.     Section 99-19-51(6)(c) addresses exemptions from *disclosures*. The Legislature has

plenary authority to amend the law. *See **Musgrove v. Vicksburg & N.R. Co.***, 50 Miss. 677,

682-83 (1874). The adoption date of the amendment established the effective date for

disclosure. Disclosure duties before passage of Section 99-19-51(6)(c) are of no

consequence. Thus, retroactivity is not at issue. It follows that Section 99-19-51(6)(c) applies

*prospectively* to *disclosure* of information not deemed as exempt after passage.

> [I]t is not for the courts to decide whether a law is needed and advisable
> in the general government of the people. That is solely a matter for the wisdom
> of the Legislature. But, it is our duty to construe the law and apply it to the
> case presented. . . .

***City of Belmont v. Miss. State Tax Comm'n***, 860 So. 2d 289, 307 (Miss. 2003) (quoting

***Moore v. Grillis***, 205 Miss. 865, 888, 39 So. 2d 505, 509 (1949)).

¶9.     This Court held in 1874 that:

> if there has been a change or alteration, or repeal of the law applicable to the
> rights of the parties, after rendition of the original judgment, and pending the
> appeal, the case must be heard and decided in the appellate court, according
> to the then existing law.

*Musgrove*, 50 Miss. at 682.  In ***Crow v. Cartledge***, 99 Miss. 281, 54 So. 947 (1911), we

addressed the necessity of "finality of judgment" with regard to new law:

> The effect of a repealing statute of this character is to abrogate the repealed
> statute as completely as if it had never been passed. It is considered as a law
> which never existed, except for suits which were commenced and *concluded*
> while the repealed law was in force.

*Crow*, 54 So. at 948 (emphasis added). Therefore, it is well-settled:

---

findings that disclosure of the documents was required because the Legislature did not
amend the law, implicitly recognizing the Legislature's prerogative to change the law.

by the decisions of our Court, and in most every other jurisdiction, that when proceedings are in process under a statute and have not been completed, and have not reached the stage of final judgment, and a new act is passed, modifying the statute under which the proceedings were begun, the new statute becomes integrated into and a part of the old statute as fully as if written therein from the very time the old statute was enacted. . . .

*Oliphant v. The Carthage Bank*, 224 Miss. 386, 410, 80 So. 2d 63, 72 (1955).

¶10. When the Legislature chooses to amend or modify any law related to a pending action, this Court applies the Legislature's most recent pronouncement. *USPCI of Mississippi, Inc. v. State ex rel. McGowan*, 688 So. 2d 783, 787 (Miss. 1997). We treat the new pronouncement as if it always had been in the Code, unless the Legislature chooses to include a saving clause:[8]

An amended act is ordinarily construed as if the original statute had been repealed, and as far as any action after the adoption of the amendment is concerned, as if the statute had been originally enacted in its amended form. *Beatty v. State*, 627 So. 2d 355, 357 (Miss. 1993); *Stone v. Independent Linen Service Co.*, 212 Miss. 580, 55 So. 2d 165 (1951); *McCullen v. Sinclair Refining Co.*, 207 Miss. 71, 41 So. 2d 382 (1949). This Court in *Stone* reiterated the law set forth in *Deposit Guaranty Bank & Trust Co. v. Williams*, 193 Miss. 432, 9 So. 2d 638 (1942):

Many decisions in this state have affirmed the rule, which generally prevails, . . . that a statute modifying previous statute has the same effect as though the statute had all the while previously existed in the same language as that contained in the

[8] In the present case, the Legislature did not include a saving clause. "Saving clause" has been defined as "[a] statutory provision exempting from coverage something that would otherwise be included. A saving clause is generally used in a repealing act to preserve rights and claims that would otherwise be lost." *Saving Clause*, Black's Law Dictionary 1146 (abr. 9th ed.). If the Legislature amends a statute and purposefully does not include a saving clause, applying the new law to pending cases necessarily will conflict with the outdated version. *See Robinson v. Morgan*, 2017 WL 841107, No. 2016-CA-00549 (Miss. Mar. 2, 2017).

6

> modified statute, unless the . . . modifying statute contains a saving clause.
>
> ***Stone***, 212 Miss. 580, 586-8, 55 So. 2d 165, 168 (quoting ***Deposit Guaranty***, 193 Miss. 432, 438, 9 So. 2d 638, 639) [Citations omitted.].

***USPCI***, 688 So. 2d at 786-87 (emphasis added).

> The result of this rule is that every right or remedy created solely by the . . . modified statute disappears or falls with the . . . modified statute, unless carried to final judgment before the . . . modification, – save that no such . . . modification shall be permitted to impair the obligation of a contract or to abrogate a vested right.[9]

***Deposit Guar.***, 9 So. 2d at 639. There is no basis to depart from these well-reasoned decisions. Such holdings are not unique to this state, for the same principle is followed by other states and the federal courts in public-records-request cases.

¶11.   In ***State ex. rel. Pittman v. Ladner***, 512 So. 2d 1271 (Miss. 1987), when considering the effect of an amended statute on existing cases, we held that "[b]ecause the statute has been changed, and because this Court is obliged to act consistent with a rational reading of the legislative declaration, we have as a matter of reason, precedent and choice determined that we should stay our hand from enforcement of that which has been repealed." ***Ladner***, 512 So. 2d at 1276-77. *See also* ***Bell v. Mitchell***, 592 So. 2d 528, 532 (Miss. 1991) ("When cases are in the bosom of this Court and there is involved a statute that is modified prior to a final decision of this Court, we take that modification into consideration.").

¶12.   This principle has been reaffirmed numerous times by this Court. In ***USPCI***, we noted that the Court previously had held in ***Fordice v. Thomas***, 649 So. 2d 835 (Miss. 1995), that

---

[9] These exceptions are discussed more fully *infra*.

the Governor's Office was an agency within the meaning of the Administrative Procedures Law (APL). *USPCI*, 688 So. 2d at 785. *See also* Miss. Code Ann. § 25-43-5 (1972). In light of the *Thomas* decision, the Governor took steps to comply with the requirements of the APL. *USPCI*, 688 So. 2d at 785. However, a group of concerned citizens filed suit, alleging the Governor's steps were inadequate. *Id.* The trial judge held that the Governor had violated the APL, and the Governor appealed. *Id.* While the appeal was pending, the Legislature amended Mississippi Code Section 25-43-5 specifically to exclude the Governor from the requirements of the APL. *Id.* at 786. Based on the precedent cited above, the *USPCI* Court held that the Governor did not have to comply with the requirements of the APL. *Id.* at 787.

¶13.    In *City of Belmont*, we held that the Legislature's passing of a new law resulted in a pending suit being abated. *City of Belmont*, 860 So. 2d at 308. Citing a long line of cases, including *Ladner*, *Stone*, and *USPCI*, the Court found that "under Mississippi case law, [the new law] should be given the full effect of its clear purpose. . . ." *Id.* at 301. In *City of Starkville v. 4-County Electric Power Association*, 909 So. 2d 1094, 1115 (Miss. 2005), we held that a statutory amendment was applicable to the pending legislation.

> Today, there is not only clear legislative intent that H.B. 997 should indeed apply to this instant litigation, there is also clear precedent indicating that, if the Legislature chooses to amend a statute while a case is still pending, we will apply that amendment as if it had been part of the statute all along.

*City of Starkville*, 909 So. 2d at 1111.

8

¶14.    The Justice Center asks this Court to ignore Section 99-19-51 and to restrict our analysis to Sections 25-61-1 to 25-61-19, an invitation accepted by the dissent.[10] It would be a breach of our duty to confine our analysis to only the MPRA. We cannot don blinders and pretend Section 99-19-51 does not exist. This Court has not followed that path in the past, nor should it today. While the Justice Center's request was filed pursuant to the MPRA, Section 99-19-51 specifically amended MDOC's duty to disclose documents requested under the MPRA.

¶15.    This Court previously has addressed that subissue as well, i.e., one statute amending another. In **Beatty**, state authorities seized sixteen slot machines. **Beatty**, 627 So. 2d at 356. At the time of the seizure, ownership of gaming devices was barred by Mississippi Code Section 97-33-7. *Id.* at 356. Beatty moved for return of the seized slot machines, arguing the machines were not being used for illegal gambling. *Id.* The trial court denied the motion, and Beatty appealed. *Id.* While the case was on appeal, the Legislature enacted a new statute, Mississippi Code Section 27-27-12, which provided an exception to the prohibition against ownership of gaming devices for antique slot machines. *Id.* The **Beatty** Court noted that there

_____

[10] On one hand, the dissent opines that "the amendment of Section 99-19-51 clearly does not apply to this suit filed under the 'Public Records Act[,]'" (Dis. Op. at ¶ 49), yet it contrastingly opines that Section 99-19-51 "exempts from disclosure under the 'public records act' the identities of certain entities and individuals involved in an execution." *See* Dis. Op. at ¶ 44. The former is easily disproved when the language of the statute is read verbatim: "The identities of all members of the execution team, a supplier of lethal injection chemicals, and the identities of those witnesses listed in Section 99-19-55(2) who attend as members of the victim's or the condemned person's immediate family shall at all times remain confidential, and **the information is exempt from disclosure under the provisions of the Mississippi Public Records Act of 1983**." Miss. Code Ann. § 99-19-51(6)(c) (emphasis added).

was no saving clause in either Section 97-33-7, which also was amended, or Section 27-27-12, and that the case had not proceeded to final judgment. *Id.* at 357. The ***Beatty*** Court held that "[t]he application of Section 27-27-12 and the resultant amendment to Section 97-33-7 is not a charitable raising of an issue not raised but is a necessary application of existing law to which the appellant is entitled. We simply cannot apply the law as it was and is not anymore." *Id.* at 358.

¶16.   In this case, the Legislature specifically referenced MPRA exemptions in its amendment to Section 99-19-51. Any argument that the Legislature's amendment is not applicable to this case is contrary to our existing law.

¶17.   Despite the adoption of new law by the Legislature by the enactment of Section 99-19-51 and the clear pronouncements of law that the amended statute must be treated as if it were always a part of the old statute, the Justice Center alternatively argues that it had a "right" to obtain documents via a public records request (which is purely a creation of statute), equating to a contract or vested right. ***Ladner*** dispels that notion. In ***Ladner***, this Court defined a vested right as "[1] a contract right, [2] a property right, or [3] a right arising from a transaction in the nature of a contract which has become perfected to the degree that it is not dependent on the continued existence of the statute." ***Ladner***, 512 So. 2d at 1275-76.

A.    Property Right

¶18.   The Justice Center makes no claim of a vested property right, for, indeed, it has none. Thus, we can dispense with the second right addressed by ***Ladner***.

B.    Contract Right

10

¶19.	In determining whether the Justice Center had a contractual right, we look for the essential elements required to form a contract. They are "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, **and** (6) no legal prohibition precluding contract formation." *Caplin Enters., Inc. v. Arrington*, 145 So. 3d 608, 613 (Miss. 2014) (emphasis added). There is no evidence in this record of "an agreement that is sufficiently definite" or evinces "mutual assent," or a meeting of the minds, as between the Justice Center and MDOC, that, for accepting whatever sum was calculated for reimbursement, MDOC agreed to disclose everything the Justice Center requested. The record reveals just the opposite. The Justice Center's argument that it somehow obtained a "vested right" to the requested documents, merely because it tendered payment to MDOC for some records, lacks reason or authority, and thus fails.[11]

¶20.	Additionally, no contract has been submitted to this or the trial court, nor was the trial action brought for a breach of contract. The Justice Center never obtained a contract right in any records that MDOC refused to provide–those documents for which it claimed privilege, confidentialty, or subject to an exemption or exception. Such argument is without a basis in fact and is implausible. Therefore, there is no contract right as created by *Ladner*.

C.	Quasi-Contract Right

---

[11] The MPRA requires that "each public body may establish and collect fees reasonably calculated to reimburse it for . . . the actual cost of searching, reviewing and/or duplicating and, if applicable, mailing copies of public records. . . . Such fees shall be collected by the public body in advance of complying with the request." Miss. Code Ann. § 25-61-7 (Rev. 2010).

11

¶21. *Ladner* finally recognizes a quasi-contract "right" "which has become perfected to the degree that it is not dependent on the continued existence of the statute." *Ladner*, 512 So. 2d at 1276. *See also Musgrove*, 50 Miss. at 683 ("We accept the doctrine of the law to be, that the repeal of a statute necessarily terminates all proceedings under it, unless rights have accrued which can not be divested."). In *Musgrove*, we held that "a right to a particular remedy is not a vested right." *Musgrove*, 50 Miss. at 684. In *Ladner*, we specifically held that the vested right must have been "[in] being as a right notwithstanding the statute's nonbeing." *Ladner*, 512 So. 2d 1276. The Justice Center's claim to the documents is wholly dependent upon our statutes. Without the MPRA, no right to the documents exists, for no such right existed at common law.

¶22. Finally, the Justice Center contends that it has a private right to the documents, which cannot be divested. Long ago, the United States Supreme Court delineated the distinction between private and public rights in *Hodges v. Snyder*, 261 U.S. 600, 603, 43 S. Ct. 435, 436, 67 L. Ed. 819 (1923). *Hodges* held that the "private right of parties which have been vested by the judgment of a court cannot be taken away by subsequent legislation, but must be thereafter enforced by the court regardless of such legislation." *Id.* This rule, however, does not apply "to a suit brought for the enforcement of a public right, which, even after it has been established by the judgment of the court, may be annulled by subsequent legislation and should not be thereafter enforced. . . ." *Id.* In *Deposit Guaranty*, this Court held essentially the same: "[a]lthough a right conferred solely by statute in the public interest may have accrued before the repeal or modification, it does not follow that the accrued right in

12

such cases is a vested right, in the constitutional sense." ***Deposit Guar.***, 9 So. 2d at 640. "By the great weight of authority, the legislature may repeal a [] law and no one has any vested right to take advantage of such laws." ***Id.*** (citation omitted).

¶23. The United States Supreme Court more recently has held that there is "no constitutional right to obtain all the information provided by [Freedom of Information Act] FOIA laws." ***McBurney v. Young***, 133 S. Ct. 1709, 1718, 185 L. Ed. 2d 758 (2013). Similarly, the United States Court of Appeals for the Ninth Circuit, interpreting the Federal Freedom of Information Act (FOIA), held that a district court properly applied an exemption which had been enacted after the plaintiffs requested information. ***Southwest Ctr. for Biological Diversity v. United States Dep't of Agric.***, 314 F.3d 1060 (9th Cir. 2002).The SCBD brought action in federal court to compel the Forest Service to release information previously requested under the FOIA regarding a rare western bird of prey. ***Id.*** at 1061. While the action was pending, Congress enacted the 1998 Parks Act, which provided that information on endangered or threatened animal species could be withheld from the public in response to requests under the FOIA. ***Id.*** The district court held that the Parks Act applied. ***Id.***

¶24. The Ninth Circuit held:

> There is no such impermissible retroactive effect here. The Center contends that application of § 207 "impairs [a] right[ ] [the Center] possessed when [it] acted," because the Center had a right to the information when it filed its suit (or when it made its earlier request) and it loses that right by application of the new exemption. But the "action" of the Center was merely to request or sue for information; it was not to take a position in reliance upon existing law that would prejudice the Center when that law was changed. . . . Moreover, as the district court pointed out, application of the exemption furthers Congress's

13

intent to protect information regarding threatened or rare resources of the National Parks. This case accordingly presents one of the many situations in which courts appropriately apply the law in existence at the time of their decision.

*Biological Diversity*, 314 F.3d at 1062.

¶25. A number of sister states also have rejected the argument that an individual has a private, vested right in an open-records request, as well as addressing the effect of subsequent legislation. *See Deal*, 294 Ga. at 184, 751 S.E.2d at 349 ("[W]e conclude that the right of access afforded by the former [Open Records] Act is a public right of the People as a whole. As such, it could not vest in any particular persons, whether upon the making of a request for public records, or upon the filing of an action to enforce the public right. Accordingly, there is *no constitutional impediment to the retroactive modification of the Act by subsequent legislation*.") (emphasis added); *Police Patrol Sec. Sys., Inc. v. Prince George's Cty.*, 378 Md. 702, 722, 838 A.2d 1191, 1202 (2003) ("The amendment [of the public records act in the wake of the attacks of September 11, 2001] was intended immediately to authorize the potential nondisclosure of records listed in Section 10-618(j) to the public before more lives or property could be put at risk. The goal was to protect information. Thus, the amendment, in order to effectuate its objective, applies to all covered information that already has not been disclosed to the public, *including requests that were pending and denials appealed as of the time of its enactment*.") (emphasis added).

¶26. In *Campus Communications, Inc. v. Earnhardt*, 821 So. 2d 388 (Fla. Dist. Ct. App. 2002), the Estate of Dale Earnhardt, who was killed in a racing accident, obtained an ex parte injunction precluding the medical examiner from releasing thirty-three photographs taken

14

during Earnhardt's autopsy. *Earnhardt*, 821 So. 2d at 392. Subsequently, a newspaper and individual requested the photographs under the Public Records Act. *Id.* Both requests were denied pursuant to the injunction. *Id.* After the requests were denied, the Florida Legislature enacted Florida Statute Section 406.135, which declared autopsy photographs to be exempt from the Public Records Act. *Id.* Pursuant to the passage of the statute, the estate amended its request to include permanent injunctive relief under the state. *Id.* Campus filed a cross-claim, seeking an order under the Public Records Act to allow inspection and copying of the photographs. *Id.* The trial court held that the new statute was constitutional and *retroactively applicable* to the requests. *Id.*

¶27.    On appeal, Campus claimed that it had a vested right to inspect and copy the autopsy photographs of Earnhardt. *Id.* The Florida Appeals Court disagreed, holding that it was not a vested right for two reasons: "1) the right to inspect and copy public records is a right subject to divestment by enactment of statutory exemptions by the Legislature; and 2) the rights provided under the Public Records Act are public rights." *Id.* at 398. The Florida Court held that:

> the right to inspect and copy public records is a right subject to divestment by legislative enactment. Hence, the right claimed by Campus to view the autopsy photographs is not a "fixed" right and thus it is not a vested right within the context of the constitutional prohibition against retroactive application of legislation. Rather, it is more akin to "an expectation based on an anticipation of the continuance of an existing law" with the "existing law" being the Public Records Act, and the "anticipation" being the maintenance of the current provisions of the Act unchanged by the Legislature's enactment of exemptions.

*Id.* at 399. The Florida Court also held that: "To be vested a right must be more than a mere expectation based on an anticipation of the continuance of an existing law; it must have

15

become a title, legal or equitable, to the present or future enforcement of a demand. . . .” *Id.*

at 398. Similarly, the MPRA establishes a general public right but does not establish any type

of private, vested right that can withstand the application of a specific exemption provided

by the Legislature.

¶28.    Any rights involved in the present suit are public rights shared by all. This is evident

by the declaration in the MPRA that “[i]t is the policy of the Legislature that public records

must be available for inspection by *any person* unless otherwise provided by this act. . . .”

Miss. Code Ann. § 25-61-1 (emphasis added). It is not a vested right for two reasons: 1) the

right to inspect and copy public records is a right subject to divestment by enactment of

statutory exemptions by the Legislature; and 2) the rights provided under the MPRA are

public rights.

> If we were to accept the argument advanced by [the Justice Center] that once
> a public record is created, a member of the public has a vested right to inspect
> and copy it, we would have to conclude that a statute that establishes an
> exception to the [MPRA] may never be applied retroactively. Adoption of such
> a rule would eliminate the Legislature’s ability to enact remedial legislation to
> immediately resolve problems caused by public disclosure and to mitigate the
> sometimes harsh provisions of the [MPRA]. Moreover, adoption of such a rule
> would require us to ignore decisions of the courts of this state that have given
> retroactive application to such statutory exemptions. . . .

*Id.* at 401. Thus, the argument advanced by the Justice Center that the  application of the

amended law abrogates a vested right likewise should be rejected.

¶29.    Application of the exemption to the MPRA has no impermissible retroactive effect

in the present case. The Justice Center acquired no vested rights in the information merely

as a result of submitting its request. Nor had the Justice Center taken a prejudicial position

16

in reliance on receiving the information. The Justice Center was not denied a right to sue in open court to obtain the information.

## CONCLUSION

¶30.    While the Legislature established a statutory right of access to public records in the MPRA, it exempted the disclosure of those documents sought in today's case. This Court chooses to follow the law as set forth by the Legislature. Accordingly, we vacate the trial court's judgment and render a decision in favor of MDOC.

¶31.    **VACATED AND RENDERED.**

**WALLER, C.J., COLEMAN, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR. DICKINSON, P.J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION.   KING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, J.**

**DICKINSON, PRESIDING JUSTICE, CONCURRING IN RESULT ONLY:**

¶32.    Our law has long recognized a presumption against the retroactive application of statutes.[12] It also has recognized the principle the majority employs today: a presumption that statutory amendments apply to actions pending when the statute is amended.[13]  I believe the

---

[12] *See, e.g.*, **Mladinich v. Kohn**, 186 So. 2d 481, 483 (Miss. 1966) ("In a long line of cases, this Court has followed the rule that, in the interpretation of statutes, they will be construed to have a prospective operation only, unless a contrary intention is manifested by the clearest and most positive expression.") (citations omitted).

[13] *See, e.g.*, **Musgrove v. Vicksburg & Nashville R.R. Co.**, 50 Miss. 677, 682 (1874) ("The authorities cited hold that if there has been a change or alteration, or repeal of the law applicable to the rights of the parties, after rendition of the original judgment, and pending the appeal, the case must be heard and decided in the appellate court, according to the then existing law.").

former represents the better view and should control our decision. That said, either presumption reaches the same result.

¶33. The majority correctly points out that its chosen principle—the pending-action canon—is accepted by many courts.[14] But this rule is not universal. Some states, for instance, employ a presumption that the law at the time suit is filed controls.[15] More significantly, the pending-action canon has met resistence in the United States Supreme Court.[16]

¶34. The majority cites the Ninth Circuit Court of Appeals's decision in *Southwest Center for Biological Diversity v. United States Department of Agriculture*, which found that an amendment to the federal Freedom of Information Act should apply to an action for documents under the statute pending when the amendment occurred.[17] In that case, the Ninth

---

[14] Maj. Op. at ¶10 ("Such holdings are not unique to this state, for the same principle is followed by other states and the federal courts in public-records-request cases.").

[15] *See e.g. Doll v. Doll*, 794 N.W.2d 425, 427 n.1 (N.D. 2011) ("This case was filed while the prior version of the law was in effect. Accordingly, we apply the law in effect at the time of filing.").

[16] *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 289, 114 S. Ct. 1522, 128 L. Ed. 2d 229 (1991) (Scalia, J., concurring) (citing *Bradley v. School Bd. of Richmond*, 416 U.S. 696, 711–16, 94 S. Ct. 2006, 2016–19, 40 L. Ed. 2d 476 (1974)) ("The Court's opinion begins with an evaluation of petitioner's argument that the text of the statute dictates its retroactive application. The Court's rejection of that argument cannot be as forceful as it ought, so long as it insists upon compromising the clarity of the ancient and constant assumption that legislation is prospective, by attributing a comparable pedigree to the nouveau *Bradley* presumption in favor of applying the law in effect at the time of decision.").

[17] Maj. Op. at ¶¶23–24 (citing *Southwest Ctr. for Biological Diversity v. U.S. Dep't of Agric.*, 314 F.3d 1060, 1061 (9th Cir. 2002)).

Circuit applied the United States Supreme Court's decision in ***Landgraf v. USI Film Products***.[18]

¶35.    In ***Landgraf***, the United States Supreme Court employed the same principle the majority applies today: "Although we have long embraced a presumption against statutory retroactivity, for just as long we have recognized that, in many situations, a court should 'apply the law in effect at the time it renders its decision.'"[19] Justice Scalia authored a concurring opinion explaining this principle's flaw:

> The critical issue, I think, is not whether the rule affects "vested rights," or governs substance or procedure, but rather what is the relevant activity that the rule regulates. Absent clear statement otherwise, only such relevant activity which occurs after the effective date of the statute is covered. Most statutes are meant to regulate primary conduct, and hence will not be applied in trials involving conduct that occurred before their effective date. But other statutes have a different purpose and therefore a different relevant retroactivity event. A new rule of evidence governing expert testimony, for example, is aimed at regulating the conduct of trial, and the event relevant to retroactivity of the rule is introduction of the testimony. Even though it is a procedural rule, it would unquestionably not be applied to testimony already taken—reversing a case on appeal, for example, because the new rule had not been applied at a trial which antedated the statute.[20]

¶36.    In other words, to determine whether the statutory amendment should apply, a court must understand what event or conduct the statute will control.  If the statutory amendment merely regulates primary conduct—in this case the primary conduct was the Justice Center's request for the documents and MDOC's decision to provide heavily redacted versions—then

---

[18] ***Southwest Ctr. for Biological Diversity***, 314 F.3d at 1061–62 (citing ***Landgraf***, 511 U.S. at 273).

[19] ***Landgraf***, 511 U.S. at 273 (quoting ***Bradley***, 416 U.S. at 711).

[20] ***Landgraf***, 511 U.S. at 291 (Scalia, J., concurring).

the presumption against retroactivity should control because we are considering a truly retroactive application.[21] On the other hand, if the statutory amendment regulates or controls something else, something later, the line of demarcation for the presumption against retroactivity changes.

¶37. Here, that is the case. In *Landgraf*, Justice Scalia noted that injunctive relief is prospective—it orders someone either to do or not to do something in the future.[22] So amendments to statutes affecting a party's right to injunctive relief ordinarily will apply because the requested injunction does not remedy a past wrong—which would be retroactive—it orders future action—which is prospective.[23] The Justice Center asks this Court to affirm an order requiring MDOC to release the relevant documents. The law, as it currently stands, declares this information confidential.[24]

---

[21] Black's Law Dictionary defines "retroactive" as "extending in scope or effect to matters that have occurred in the past." *Retroactive*, Black's Law Dictionary 1122 (abr. 9th ed.). It defines "retroactive law" as "[a] legislative act that looks backward or contemplates the past, affecting acts or facts that existed before the act came into effect." *Retroactive Law*, Black's Law Dictionary 1122 (abr. 9th ed.).

[22] *Landgraf*, 511 U.S. at 293 (citing **American Steel Foundries v. Tri-City Cent. Trades Council**, 257 U.S. 184, 42 S. Ct. 72, 66 L. Ed. 189 (1921); **Duplex Printing Press Co. v. Deering**, 254 U.S. 443, 464, 41 S. Ct. 172, 175–76, 65 L. Ed. 349 (1921)) ("Courts traditionally withhold requested injunctions that are not authorized by then-current law, even if they were authorized at the time suit commenced and at the time the primary conduct sought to be enjoined was first engaged in.").

[23] *Landgraf*, 511 U.S. at 293 ("Since the purpose of prospective relief is to affect the future rather than remedy the past, the relevant time for judging its retroactivity is the very moment at which it is ordered.").

[24] Miss. Code Ann. § 99-19-51(2) (Supp. 2016) (current version 2017 Miss. Laws H.B. 638 and now Miss. Code Ann. § 99-19-51(6)(c)) ("The identities of all members of the execution team, a supplier of lethal injection chemicals, and the identities of those witnesses

¶38. I have no doubt that the Justice Center was entitled to the information it sought in November 2014 when it requested it. But the Justice Center seeks prospective relief: an order that MDOC must now release that information. Under current law, the information is confidential. So I agree we cannot grant the remedy requested.

¶39. That said, though not before us in this Public Records Act case, I question the constitutionality of the State's legislative efforts to deny death-row inmates access to the information necessary to litigate their Eighth Amendment claims. But this issue is not now before us and will have to be addressed at a later date.

**KING, JUSTICE, DISSENTING:**

¶40. Because Section 99-19-51 does not apply to the case at hand, and because the chancery court did not err in its judgment in this case, I would affirm the judgment of the chancery court, and therefore respectfully dissent.

**DISCUSSION**

¶41. The Mississippi Public Records Act (MPRA) governs the extent to which information held by a public body may be accessed by members of the public. The MPRA declares the public policy of the State of Mississippi to be that:

> public records shall be available for inspection by any person unless otherwise provided by this chapter; furthermore, providing access to public records is a duty of each public body and automation of public records must not erode the right of access to those records. . . .

Miss. Code Ann. § 25-61-2 (Rev. 2010).

---

listed in Section 99-19-55(2) who attend as members of the victim's or the condemned person's immediate family shall at all times remain confidential.").

21

¶42.    The MPRA defines "public records" to include:

all books, records, papers, accounts, letters, maps, photographs, films, cards, tapes, recordings or reproductions thereof, and any other documentary materials, regardless of physical form or characteristics, having been used, being in use, or prepared, possessed or retained for use in the conduct, transaction or performance of any business, transaction, work, duty or function of any public body, or required to be maintained by any public body.

Miss. Code Ann. § 25-61-3(b) (Rev. 2010).

¶43.    Section 25-61-5(1) specifically provides for "public access to records":

Except as otherwise provided by sections 25-61-9 and 25-61-11, all public records are hereby declared to be public property, and any person shall have the right to inspect, copy or mechanically reproduce or obtain a reproduction of any public record of a public body in accordance with reasonable written procedures adopted by the public body concerning cost, time, place and method of access, and public notice of the procedures shall be given by the public body, or, in the event that a public body has not adopted such written procedures, the right to inspect, copy or mechanically reproduce or obtain a reproduction of a public record of the public body shall be provided within one (1) working day after a written request for a public record is made.

Miss. Code Ann. § 25-61-5(1) (Rev. 2010).

### I.    Whether Senate Bill 2237 applies retroactively to the Justice Center's records request.

¶44.    The Legislature passed S.B. 2237 on May 3, 2016.  It amended Mississippi Code Section 99-19-51, which delineates the method of execution used for inflicting the punishment of death.  Miss. Code Ann. § 99-19-51 (Supp. 2016).  It exempts from disclosure under the public records act the identities of certain entities and individuals involved in an execution.[25]  "This act shall take effect and be in force from and after its passage."  S.B.

_____

[25]The majority claims that a retroactivity analysis is not applicable because this law applies to disclosures and not to requests.  This is a distinction without a difference.  The obligation to disclose documents occurs upon submission of a valid request, and no

22

2237, § 2. We must answer the question of whether the exemption applies retroactively to a public record request made before its passage.

¶45. As an aside, the majority maintains that the sole issue before this Court is whether the 2016 amendments to Mississippi Code Section 99-19-51 have retroactive application so as to render moot the Justice Center's public records request for documents regarding the carrying out of the death penalty by the State. Throughout this process, the issue at the heart of the matter was in fact the death penalty. The State's brief recognized this and couched much of this case as a public policy or political argument about the death penalty. It opened its brief with the statement that "Capital punishment implicates State interests of the highest order. Carrying out a sentence of death is the ultimate expression of the State's authority, and the ultimate enforcement of the State's criminal justice system." It argued that "[i]n deciding the outcome of this appeal, it is critical that the Court consider not only the interest of the public in access to information, but the interest of the executive branch in faithfully executing *all* laws of the State, including the duty to carry out the execution of an offender . . . ." It maintained that "[t]his lawsuit is but one aspect of the Justice Center's ongoing assault on capital punishment in Mississippi[,]" further stating that "[a]nti-death-penalty advocates are engaged in a well-documented 'guerilla war' against capital punishment, attempting to choke off the supply of drugs suitable for use in executions that are still available to the states. This Court should not permit the Justice Center to create a *de facto*

obligation to disclose exists without such a request. Thus, we should examine the disclosure that MDOC was required to make at the time the request was made (and, at the time the disclosure was actually required).

23

injunction against capital punishment by means of a backdoor attack under the Public Records Act." The State raised the same public policy or political concerns about the death penalty in its oral presentation, opening its presentation by stating that "[i]t is important for the Court to understand that this is not a garden-variety public records lawsuit. This particular lawsuit is part of an ongoing dispute between MacArthur Justice Center and MDOC regarding the production of [documents] related to the State's procurement of lethal injection drugs for use in executions." It argued that the Justice Center wants this Court "to hold and believe that the Public Records Act trumps all other State interests, including the State's interests in carrying out the death penalty, which is a State interest of the highest order." It asserted that if this Court declined to reverse the chancery court, "it will severely impede, if not curtail, the executive branch of government's ability to carry out death sentences . . . ." Additionally, members of this Court addressed the public policy or political issues in questions posed to the parties during argument, with many questions focusing on why the disclosure of documents would prevent or impede the State's carrying out the death penalty.

¶46. Senate Bill 2237 happened to pass while this appeal had been pending in this Court for many months. MDOC filed a notice of appeal in this case on March 9, 2015. On April 9, 2015, MDOC requested that this Court grant a stay of the chancery court's decision pending appeal. MDOC filed an amended notice of appeal on April 30, 2015. Briefing in this case was completed on September 1, 2015, and the case was argued on November 17, 2015. S.B. 2237 was introduced on February 5, 2016. It passed the Senate on March 1, 2016,

24

and passed the House on March 25, 2016. The House and Senate conference reports were adopted on April 19, 2016. The enrolled bill was signed by the House and Senate on April 26, 2016. On May 3, 2016, nearly six months after this case was argued and submitted, the governor signed the bill and it became effective the same day. On May 5, 2016, less than one month shy of this Court's statutory 270 day deadline in this case, this Court ordered additional briefing on its applicability. This Court has been dilatory in its disposition of this case. If, as the majority says, the sole issue is the application of Section 99-19-51, then that is because this Court, by the dilatory manner in which it has disposed of this case, has either wittingly or unwittingly allowed its actions to be impacted by legislative actions.

¶47. At the outset, the plain language of the amendment indicates that it should be applied prospectively only. The Legislature specifically chose to note that Senate Bill 2237 would be in effect from and after its passage. This is a clear indication that the amendment applies prospectively to record requests made after the passage of the law, and not retroactively to record requests made prior to the law's passage. ***Jones v. Baptist Mem'l Hosp.-Golden Triangle, Inc.***, 735 So. 2d 993, 998 (Miss. 1999) (If the language of the bill "mandates that the statute is to apply from and after passage, it is not to be applied retroactively to causes of action which accrued prior to the passage of the statute.").

¶48. MDOC argues that amendments to laws have the same effect as if the statute had always been in existence as amended, unless the amendment contains a savings clause. MDOC argues that when proceedings under a statute are in process and have not reached final judgment, and a new act is passed modifying the statute under which proceedings were

25

begun, then the rule applies that the new statute governs as if it had been part of the old statute the entire time, citing *City of Starkville v. 4-County Electric Power Association*, 909 So. 2d 1094, 1110 (Miss. 2005). Yet, *City of Starkville* is distinguishable from the case at hand. In *City of Starkville*, the Legislature passed a public utilities law in 1987, which in 2002 this Court declined to apply to a 1963 contract. *City of Starkville*, 909 So. 2d at 1099. The Court in the 2002 decision noted that if the Legislature had wanted to invalidate existing contracts, it should have said so plainly. *Id.* A short time after the 2002 decision handed down, the Legislature introduced a 2002 bill specifically clarifying that the 1987 amendments applied to pre-1987 contracts. *Id.* at 1099-1100, 1104-06. Thus, the amendment at issue *specifically and in plain language* stated that it applied retroactively to contracts prior to 1987. Clearly, an amendment that was enacted solely for the purpose of stating that a statute applied retroactively is meant to be applied retroactively.

¶49. First, the legal principle argued by MDOC does not apply based on its own plain language. It is that when proceedings *under a statute* are in process and *that statute* is amended, the amendment may affect the proceedings. This case was not filed under Section 99-19-51; it was filed under the Public Records Act, Sections 25-61-1 to 25-61-19, which was not amended by the Legislature. Thus, the amendment of Section 99-19-51 clearly does not apply to this suit filed under the Public Records Act.

¶50. Even if Section 99-19-51 could be inserted into this litigation for the first time, the exception to this rule applies.

> In litigation between the state and an individual, where the operative statute has been repealed or amended and the litigation arises out of a pre-repeal, pre-

26

amendment transaction or occurrence, the individual may claim and be given the benefit of the prior law in effect at the operative time where he regards it more favorable to him. But the converse is not necessarily so. Unless the state holds a contract or otherwise has a vested right, a repealed or amended statute will ordinarily not be enforced against an individual where he regards it as less favorable to him.

*Mississippi Sierra Club, Inc. v. Mississippi Dep't of Envtl. Quality*, 819 So. 2d 515, 518 (Miss. 2002) (quoting *State ex rel. Pittman v. Ladner*, 512 So. 2d 1271, 1277 (Miss. 1987)). In this case, the Justice Center claims the benefit of the prior law, and should receive it.

¶51.   Moreover, the notion that an amendment may apply retroactively to ongoing litigation does not hold true when the statute modification impairs the obligation of a contract or abrogates a vested right. *Stone v. Indep. Linen Serv. Co.*, 55 So. 2d 165, 168 (Miss. 1951). A vested right must be "a contract right, a property right, or a right arising from a transaction in the nature of a contract which has become perfected to the degree that it is not dependent on the continued existence of the statute." *City of Belmont v. Miss. State Tax Comm'n*, 860 So. 2d 289, 303 (Miss. 2003) (internal quotations omitted). A contract requires "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *Caplin Enters., Inc. v. Arrington*, 145 So. 3d 608, 613 (Miss. 2014). But the right need not meet every element of a contract; it must merely occur from a transaction in the nature of a contract that has become perfected to a certain degree. The Justice Center exercised its statutory right to request documents. MDOC acquiesced to the request and demanded payment to produce the documents. The Justice Center *timely*

*paid* MDOC for the records. Once payment was tendered, the Justice Center clearly perfected a right to the records.

¶52. Additionally, the Public Records Act itself creates a type of property right to public records. It states that "[e]xcept as otherwise provided by Sections 25-61-9 and 25-61-11, all public records are hereby *declared to be public property.*" Miss. Code Ann. § 25-61-5 (Rev. 2010). The Justice Center, as a member of the public that followed the proper statutory procedure to obtain the public records, certainly has a right to those public records that have been declared public property.

¶53. I would decline to insert Section 99-19-51 into this case for the first time and therefore decline to apply its amendment retroactively to the records request at issue. And with Section 99-19-51 being inapplicable to this case, I would affirm the judgment of the chancery court on the merits for the following reasons.

II. **Whether the "Law Enforcement Exemption" protects the documents from disclosure.**

¶54. MDOC argues that the chancery court failed to give adequate consideration to Section 25-61-12, which exempts from MPRA's provisions certain private information of law enforcement agencies. Specifically, MDOC points to Section 25-61-12(2)(a), which provides that: "When in possession of a law enforcement agency, investigative reports shall be exempt from the provisions of this chapter; however, a law enforcement agency, in its discretion, may choose to make public all or any part of any investigative report." MDOC contends that the information requested by the Justice Center falls within the scope of the term "investigative report" as defined by the Legislature in Section 25-61-3(f), and the

28

implementation thereof by a "law enforcement agency" as defined by Section 25-61-3(g).

These sections, respectively, state as follows:

"Investigative report" means records of a law enforcement agency containing information beyond the scope of the matters contained in an incident report, and generally will include, but not be limited to, the following matters if beyond the scope of the matters contained in an incident report:

(i) Records that are compiled in the process of detecting and investigating any unlawful activity or alleged unlawful activity, the disclosure of which would harm the investigation which may include crime scene reports and demonstration evidence;

(ii) Records that would reveal the identity of informants and/or witnesses;

(iii) Records that would prematurely release information that would impede the public body's enforcement, investigative or detection efforts;

(iv) Records that would disclose investigatory techniques and/or results of investigative techniques;

(v) Records that would deprive a person of a right to a fair trial or an impartial adjudication;

(vi) records that would endanger the life or safety of a public official or law enforcement personnel, or confidential informants or witnesses;

(vii) Records pertaining to quality control or PEER review activities; or

(viii) Records that would impede or jeopardize a prosecutor's ability to prosecute the alleged offense.

Miss. Code Ann. § 25-61-3(f) (Rev. 2010).

¶55. "Law enforcement agency" means a public body that performs as one of its principal functions activities pertaining to the enforcement of criminal laws,

the apprehension and investigation of criminal offenders, or the investigation of criminal activities.

Miss. Code Ann. § 25-61-3(g).

¶56. MDOC argues that subsections (e) and (f) of Section 25-61-3 describe the parameters for exempt information versus nonexempt information which must be disclosed. According to MDOC, subsection (e) defines the term of art, "incident report," specifying the limited information that a law enforcement agency must produce upon request:

> "Incident report" means a narrative description, if such narrative description exists and if such narrative description does not contain investigative information, of an alleged offense, and at a minimum shall include the name and identification of each person charged with and arrested for the alleged offense, the time, date and location of the alleged offense, and the property involved, to the extent this information is known.

Miss. Code Ann. § 25-61-3(e).

¶57. MDOC acknowledges that, at first glance, the use of the term "investigative report" in Section 25-61-12 would seem to mean that documents that do not directly pertain to "investigation" of crime would not be covered. But, in defining the phrase "investigatory report" in Section 25-61-3(f), MDOC submits the Legislature created a term of art much broader than the ordinary usage of that phrase might otherwise suggest, with subparts (ii), (iii), and (vi):

> (ii) Records that would reveal the identity of informants or witnesses;
>
> (iii) Records that would prematurely release information that would impede the public body's *enforcement*, investigative or detection efforts;
>
> . . . .

(vi) Records that would endanger the life or safety of a public official or law enforcement personnel, or confidential informants or witnesses.

Miss. Code Ann. § 25-61-3(f) (emphasis added).

¶58.    MDOC adds that the term "investigative report" includes not only documents related to the investigation, detection, and deterrence of criminal conduct, but also documents related to the enforcement of state criminal law.  Further, Section 25-61-3(f) specifically protects from disclosure information that would not fall within the ordinary understanding of the term "investigative report," including records that would deprive a person of a fair trial, records pertaining to quality control or review by the PEER committee, and records that would impede a prosecutor's ability to prosecute an alleged offense.  As an example, the term "investigative report" has been interpreted to include confidential information concerning the governor's personal security detail pursuant to Section 25-61-3(f)(vi). *See Sorrell*, No. 2010-00381, 2010 WL 4105478 (Miss. A.G., Sept. 8, 2010).

¶59.    MDOC maintains that it is a law enforcement agency, charged with enforcing the criminal laws of this State once matters reach the penal phase of the criminal process and offenders are committed to it by the courts. *See generally* Miss. Code Ann. § 47-5-10 (Rev. 2010).  And it is unreasonable to think the Legislature intended to exempt from production records which, if disclosed, would hinder the investigation and prosecution of criminal offenses, but that documents which, if disclosed, would hinder the enforcement of criminal penalties deserve no protection.

¶60.    MDOC recognizes that this Court, in construing the MPRA, has said "there is to be a liberal construction of the general disclosure provisions of a public records act, whereas a

31

standard of strict construction is to be applied to the exceptions to disclosure [and] any doubt concerning disclosure should be resolved in favor of disclosure." ***Miss. Dep't of Wildlife, Fisheries and Parks v. Miss. Wildlife Enf't Officers' Ass'n, Inc.***, 740 So. 2d 925, 936 (Miss. 1999). MDOC argues, however, that in ***Wildlife***, this Court construed a "narrowly drawn" exception, which the law enforcement exception is not. MDOC contends the phrase "will include, but not be limited to" found in Section 25-61-3(f), describes a broad exemption, not a narrow one.

¶61. MDOC argues that disclosing the identity of the drug suppliers would impede MDOC's efforts to obtain and maintain an adequate supply of the necessary drugs required to carry out the lethal-injection process. MDOC contends that inadvertent disclosure of information which allowed one such supplier to be identified last year directly impeded MDOC's efforts to renew the State's supply of pentobarbital. When MDOC responded to the February 7, 2014, request for lethal injection documents from the Justice Center, MDOC attempted to redact all information which would identify the drug supplier(s) before producing those documents. But the documents had not been redacted sufficiently, and information such as the date and amount of the transactions inadvertently was disclosed. The Justice Center was able to take that information and identify the supplier by comparison with information available on the State's transparency website. The Justice Center thereafter disclosed the identity of the supplier in court documents and statements to the press. S*ee* Tracy Connor, *Mississippi Death Row Inmate Michelle Byrom Challenges Drugs*, NBC News (Mar. 28, 2014), available at http://www.nbcnews.com/storyline/lethal-

32

injection/mississippi-death-row-inmate-michelle-byrom-challenges-drugs-n66301 (last visited April 11, 2017). The Justice Center then filed a federal Section 1983 complaint in state court on behalf of two death-row inmates, challenging the constitutionality of Mississippi's lethal-injection protocol, and by virtue of subpoenas to the Mississippi supplier and to the company that sold the pentobarbital to the Mississippi pharmacy for resale, obtained all records in the possession of those entities directly.[26]

¶62. According to MDOC, since the disclosure of the identity of that supplier, MDOC has been unable to obtain a new supply of pentobarbital from any source, requiring that the State amend its lethal injection protocol to permit substitution of "other similar drugs" for sodium pentothal and/or pentobarbital before MDOC will be capable of carrying out any executions. MDOC points out that Commissioner Marshall Fisher recently informed Judge Wingate of that point in a pending Section 1983 action brought by the Justice Center on behalf of convicted capital murderers Richard Jordan and Ricky Chase. *See Jordan v. Fisher*, No. 3:15-cv-00295 (S.D. Miss. Jul. 20, 2015).[27]

_____

[26] *See Michelle Byrom and Charles Ray Crawford v. Christopher Epps, et. al.*, Chancery Court of the First Judicial District of Hinds County, Mississippi, No. G2014-420.

[27] According to MDOC, in that lawsuit, the plaintiffs allege that the states of Missouri, Texas, and Georgia have been able to replenish their supplies of pentobarbital, such that those drugs are "available" to MDOC. *See Richard Jordan, et al. v Marshall L. Fisher, et al.*, No. 3:15-cv-00295 (S.D. Miss. Jul. 20, 2015) (Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss). According to MDOC, it cannot obtain drugs from suppliers it cannot identify or locate. Missouri, Texas, and Georgia are not sharing the identities of their supplier(s) with anyone. Those states have been able to replenish their drug supplies only by keeping the identity of their supplier(s) strictly confidential. MDOC contends that if capital-punishment opponents like the Justice Center identify any of those suppliers, legal action will be taken to eliminate those suppliers as sources of lethal injection drugs, just as opponents were able to do with regard to the Woodland Pharmacy in Texas

¶63.    MDOC argues that the crucial drug in the three-drug lethal-injection protocol has been and remains the first drug, the purpose of which is to render the inmate insensate before the second and third drugs are administered. *Baze v. Rees*, 553 U.S. 35, 53-54, 128 S. Ct. 1520, 170 L. Ed. 2d 420 (2008). Without the crucial first drug, a three-drug protocol execution cannot be carried out in a humane fashion. *Id*. Thus, according to MDOC, to date, death penalty opponents have concentrated their efforts on making appropriate anesthetics unavailable for use in executions, primarily by convincing the manufacturers to prohibit distribution to the states for use in executions.

¶64.    MDOC says the second and third drugs were still available to MDOC in 2014. But without the crucial first drug, MDOC cannot carry out an execution in compliance with Mississippi Code Section 99-19-51, which requires the use of "an ultra short acting barbiturate or other similar drug." *See* Miss. Code Ann. § 99-19-51 (Rev. 2015). MDOC claims it does not have all the drugs necessary to carry out an execution lawfully, has been unable to obtain all necessary drugs, and does not anticipate obtaining drugs permitting an execution using the current three-drug protocol. MDOC claims that, since the last supplier of pentobarbital to the State was publicly "outed" by the Justice Center last year, MDOC has been unable to obtain a new supply of pentobarbital from any source.

---

and The Apothecary Shoppe in Oklahoma (which allegedly was Missouri's previous supplier). According to MDOC, since Nembutal, the only FDA-approved injectable form of pentobarbital, is unavailable for use in executions, the Justice Center is fully aware that any pentobarbital legally obtained by those States was compounded pentobarbital, the use of which the Justice Center alleges is unconstitutional.

¶65. I do agree that, in general, MDOC constitutes a law enforcement agency whose primary function is to enforce the penalty phase of the criminal process, which includes carrying out lawful executions for the state. I also note that death penalty opposition groups have instituted a campaign against drug manufacturers and suppliers – pressuring them not to supply lethal injection drugs to the states. *Glossip v. Gross*, ___U.S.___, 135 S. Ct. 2726, 2733, 192 L. Ed. 2d 761 (2015). The success of this campaign has, no doubt, impeded MDOC's ability to carry out lawful executions for the State of Mississippi under the manner prescribed by Section 99-19-51. And to this end, MDOC makes a valid argument that, without the exemptions provided under the MPRA, it will be unable to carry out its statutorily prescribed function. But this is a controversy for the Legislature.[28] As the chancery court found, the records sought by the Justice Center in this case do not fall under any of the exemption provisions prescribed by MPRA.

¶66. I would reiterate that "[t]he intent of the Legislature is manifestly clear from [the MPRA] provisions: public records which do not fall into a carefully defined exception provided by law are entirely open to access by the general public." *Miss. Dep't of Wildlife*, 740 So. 2d at 936. The records sought by the Justice Center do not constitute investigative reports, as contemplated by Section 25-61-12(2)(a), and defined by Section 25-61-3(f).

¶67. In defining the phrase "investigative report" in Section 25-61-3(f), the Legislature has not created a term of art much broader–as MDOC contends–than the ordinary usage of that phrase might otherwise suggest. As the Justice Center correctly points out, Section 25-61-

---

[28]The Legislature appears to have resolved this controversy going forward. However, it had not resolved it as of the time of the Justice Center's record request.

3(e) defines "incident report" as a "narrative description of an alleged offense"–so long as it does not contain "investigative information." Subsection (3)(e) goes on to list the types of basic information expected to be found in an incident report: the name of the arrestee, the time, date, and location of the alleged offense, and the property involved in the alleged offense. Miss. Code Ann. § 25-61-3(e) (Rev. 2010). Subsection (3)(f) is meant to be read in conjunction with subsection (3)(e). Subsection (3)(f) distinguishes the more detailed "investigative report," which contains matters that are beyond the simple information found in an incident report, and gives an illustrative list of this type of information. While MDOC is correct that the list is nonexhaustive, it is nonetheless limited to the scope of subsection (3)(f). Subsection (3)(f) chiefly contemplates the investigatory stage(s) of criminal matters, and it allows law enforcement agencies to determine what is public record and what is not at this stage of the criminal process, so as not to jeopardize the investigation and/or endanger those affiliated.

¶68. I believe that accepting MDOC's arguments on this issue would result in carving out an exception to the MPRA which the Legislature has not provided. Accordingly, this issue is without merit.

### III. The identity of MDOC's drug supplier(s) is confidential commercial information exempt from disclosure under the Public Records Act.

¶69. Section 25-61-9 contains the following provisions: . . ."[r]ecords furnished to public bodies by third parties which contain trade secrets or confidential commercial or financial information  shall not be subject to inspection, examination, copying or reproduction under this chapter until notice to said third parties has been given, but such records shall be released

36

within a reasonable period of time unless the said third parties shall have obtained a court order protecting such records as confidential." Miss. Code Ann. § 25-61-9(1) (Rev. 2010).

¶70.    Quoting from *Caldwell & Gregory, Inc. v. University of Southern Mississippi*, 716 So. 2d 1120, 1122 (Miss. Ct. App. 1998), MDOC argues that by its terms, this statutory exemption "protects a broader range of information than just that covered under the . . . definition" of a trade secret in "the Trade Secret Act." MDOC contends that, as the *Caldwell* court held, Section 25-61-9(1) exempts from disclosure any documents provided to state agencies by private third parties that contain "information regarding their financial status and business practices that they would legitimately consider confidential even though the information might not meet the strict test of being a trade secret as that term is defined in the Trade Secrets Act or previous judicial opinions." *Caldwell*, 716 So. 2d at 1122. Therefore, according to MDOC, the MPRA does not merely shield information that gives a business a competitive advantage over others by virtue of being secret; it shields any information that was furnished to a state agency with a reasonable expectation that it would remain confidential.

¶71.    The chancery court rejected MDOC's argument, holding as follows:

> And in this case there is no evidence that shows any information requested by the Justice Center contains any confidential or privileged information. There is no evidence that the information requested contains a third party's trade secrets. And there is no evidence that shows any confidential financial information is at stake of being revealed.

¶72.    I agree with the chancery court. According to the chancery court, the "fear" that releasing the name(s) of MDOC's drug supplier(s) would potentially result in "threats" and

37

"harm" to the supplier(s) was insufficient to render this information confidential within the meaning of the statute. The chancery court concluded that entities which sell lethal-injection drugs to the State assume the inherent risk of operating under the specter of harassment and harm simply by providing the State with the means to carry out executions. The chancery court stated, "It is the nature of the beast for executions to rile up fear in individuals who take part in the process leading to or during an execution."

¶73. MDOC contends that the chancery court erred as a matter of law in holding that Section 25-61-9(1) does not exempt information regarding a third party's lawful commercial transactions with a state agency when it reasonably fears public disclosure of that information will adversely affect its financial interests. MDOC argues that, under the unique circumstances at issue in this case, and given the singular nature of the information sought to be protected, this Court should conclude that any entity which provides lethal-injection drugs to MDOC legitimately considers its identity to be confidential and reasonably fears that disclosure of its identity would place it in danger and likely subject it to harassment, reprisal, and/or economic harm. As such, any information that would allow the Justice Center to publicly identify MDOC's drug supplier(s) should have been deemed "confidential commercial information" exempt from disclosure under Section 25-61-9(1).

¶74. *Caldwell* is inapplicable. There, the chancery court had ordered the University of Southern Mississippi to deliver to a competitor of Caldwell & Gregory a copy of a bid proposal submitted to the University by Caldwell & Gregory, for the operation of the coin-operated laundry facilities found in various residence halls on the campus. *Caldwell*, 716 So.

2d at 1120. Caldwell & Gregory, desiring to maintain the confidentiality of its proposal, appealed, claiming the chancery court had erred in finding that the proposal was not exempt from disclosure as an exception to the MPRA. *Id*. at 1120-21. The Court of Appeals reversed the judgment, finding that the court had applied an incorrect legal standard in ordering disclosure. *Id*. at 1121.

¶75. Here, however, no third party, as contemplated by the plain language of Section 25-61-9(1), is a part of this action. Section 25-61-9(1) clearly requires a third party to obtain "a court order protecting such records as confidential." That is not the case here.

¶76. MDOC is the entity claiming exemption under the Section 25-61-9(1), not any third-party drug-manufacturer or supplier. Accordingly, this issue is without merit.

IV.     **The Courts have inherent and statutory authority to protect the identity of lethal-injection drug-suppliers.**

¶77. MDOC argues that the chancery court committed reversible error by refusing to declare the redacted information confidential or exempt pursuant to Section 25-61-11. This section states as follows:

> The provisions of this chapter shall not be constituted to conflict with, amend, repeal or supersede any constitution or statutory law or decision of a court of this state or the United States which at the time of this chapter is effective or thereafter specifically declares a public record to be confidential or privileged, or provides that a public record shall be exempt from the provisions of this chapter.

Miss. Code Ann. § 25-61-11 (Rev. 2010).

¶78. Citing *Estate of Cole v. Ferrell*, 163 So. 3d 921 (Miss. 2012), MDOC argues that this Court has expressly recognized the courts' authority to declare public records confidential or exempt pursuant to Section 25-61-11. *Ferrell* stated:

> [T]he [MPRA] does not conflict with the court's authority to declare a public record confidential or privileged . . . . A court may, within its discretion, determine if nonexempt matters should be declared confidential or privileged, removing those documents from public disclosure.

*Ferrell*, 163 So. 3d at 925. In conclusion, *Ferrell* held that, "[t]he law allows courts to determine when information should be declared confidential or privileged, exempting it from the Public Records Act." *Id*. at 929. In determining whether records should be confidential or exempt, a court must "balance[e] the parties' competing interests–the public's right of access versus confidentiality." *Id*. at 924.

¶79. MDOC claims the chancery court did not perform the balancing test described in *Ferrell*. According to MDOC, the chancery court considered only the general interest of the public in access to information, while ignoring strong countervailing state interests. MDOC contends the court did not balance the public's interest in access against the State's interest in having the means to carry out the execution of the death sentence. And the court failed to acknowledge that the impact that disclosure would have on third-party supplier(s) and their willingness to supply additional lethal-injection drugs to MDOC was a legitimate concern. Thus, the court's failure to acknowledge, or even give any weight to, these important State interests was an abuse of discretion, so MDOC argues.

¶80. MDOC is incorrect that Section 25-61-11 gives courts carte blanche to declare any document whatsoever confidential. *Ferrell* is distinguishable because the document at issue

40

was a *judicial* record, and courts have long had the authority to seal judicial records. ***Ferrell*** does not stand for the proposition that courts, out of whole cloth, can create exemptions or declare any document whatsoever confidential. The chancery court did not err by failing to create a new exemption to the Public Records Act. This issue is without merit.

### V. The chancery court awarded an excessive amount of attorneys' fees to the Justice Center.

¶81. The Justice Center filed a motion for statutory penalties, attorneys' fees, and expenses, seeking a total award of $13,423.12, which the chancery court granted.

¶82. MDOC argues that, even if the chancery court did not err in concluding that MDOC had violated the MPRA, the court abused its discretion by simply accepting the gross amount requested by the Justice Center without making the searching inquiry required by this Court's decisions. MDOC essentially contends that the attorneys' fees were excessive because two attorneys worked on the case and some of the time expended by the two was unnecessarily duplicative.[29] Quoting ***McKee v. McKee***, 418 So. 2d 764 (Miss. 1982), MDOC contends that "[i]n determining an appropriate amount of attorneys fees, a sum sufficient to secure one competent attorney is the criterion by which we are directed." ***Id***. (citing ***Rees v. Rees***, 188 Miss. 256, 194 So. 750 (1940)).

¶83. The chancery court did not abuse its discretion in the total amount it awarded to the Justice Center. The chancellor was provided with an itemized account of all of the Justice

---

[29]While MDOC complains that two attorneys worked on this case for the Justice Center, the State has multiple attorneys representing it in this matter. Indeed, at the chancery court hearing, three attorneys for the State made appearances, while only one made an appearance for the Justice Center.

41

Center's attorney's fees and charges. James Craig, attorney for the Justice Center, submitted a detailed affidavit to the chancery court the time record for himself and co-counsel, Emily Washington. Reviewing this evidence, I find that it supports the chancery court's award. Craig charged a rate of $170 per hour, and Washington charged $100 per hour. Both rates were reasonable, as was the total amount of time expended on the case by both counsel. Nothing in this evidence affirmatively shows that some of the time expended by the two was unnecessarily duplicative. Based on our review of the time records, had Craig not used Washington's services, the total amount of attorney's fees would have been higher, based on Craig's hourly rate. Accordingly, this issue is without merit.

## CONCLUSION

¶84. Section 99-19-51 does not apply to this case. I would therefore affirm the Hinds County Chancery Court's order granting the Justice Center's complaint for declaratory judgment requesting that actions and omissions taken by MDOC be deemed in violation of MPRA and that MDOC be required to produce public records sought by the Justice Center. I would also affirm the chancery court's award of statutory penalties, attorneys' fees, and expenses.

**KITCHENS, J., JOINS THIS OPINION.**

42